Argued March 17, 1938.
Northern Pennsylvania Power Company, hereinafter called Northern, and Metropolitan Edison Company, hereinafter called Metropolitan, have jointly appealed from the order of the Pennsylvania Public Utility Commission refusing to issue a certificate of public convenience, approving the sale and conveyance by Northern to Metropolitan of its franchises and all its property, real, personal and mixed, under the provisions of section 23 of the General Corporation Act of April 29, 1874, P.L. 73, as amended by section 5 of the Act *Page 181 
of April 17, 1876, P.L. 30, 33 and section 1 of the Act of June 2, 1915, P.L. 724. The unusual circumstances in connection with this application require us to state the facts in more detail than is ordinarily necessary.
The joint petition of the two companies was filed on June 3, 1935, when the Public Service Company Law of July 26, 1913, P.L. 1374, was in effect. It set forth that Northern was a public service company, duly formed by merger and consolidation, and letters patent thereon dated May 7, 1923, which by proceedings, approved by the Public Service Commission, had acquired by purchase the franchises and all the property of various electric companies, and has valid charter rights to furnish light, heat and power by means of electricity to the public in various places in the Counties of Bradford, Lackawanna, Lycoming, Potter, Sullivan, Susquehanna, Tioga, Wayne and Wyoming, and manufactured gas and steam heat service in the Borough of Towanda, Bradford County. Its authorized capital stock consisted of 50,000 shares of common stock of no par value, of which there were issued and outstanding as of April 30, 1935, 22,130 shares; and 3,500 shares of preferred stock of the par value of $100, none of which was then issued and outstanding. The authorized indebtedness of Northern was $10,000,000, of which bonds in the amount of $4,685,000 had been issued as of April 30, 1935. Of these $269,500 were held in the sinking fund and $608,000 in its treasury. A general balance sheet showing the assets and liabilities of Northern as of April 30, 1935 and a statement of its income and expenses for the year ended April 30, 1935 were attached.
The petition further set forth that Metropolitan was a public service company duly formed by merger and consolidation, and letters patent thereon dated July 24, 1922, which by proceedings, approved by the Public Service Commission, had acquired by purchase the franchises and all the property of various electric, gas and *Page 182 
water power companies, and has valid charter rights to furnish light, heat and power, by means of electricity, to the public in various places in the Counties of Adams, Berks, Bucks, Chester, Cumberland, Dauphin, Lancaster, Lebanon, Lehigh, Monroe, Montgomery, Northampton, Pike and York; and also light, heat and fuel, by means of gas, in the City of Easton, Northampton County, Borough of Pen Argyl, Northampton County, Borough of Hamburg, Berks County, and Borough of Elizabethtown, Lancaster County, and steam heat in the City of Easton aforesaid. Its authorized capital stock consisted of 500,000 shares of common stock of no par value, of which there were issued and outstanding as of April 30, 1935, 360,780 shares; and six classes of preferred and prior preferred stock, all without nominal or par value, aggregating 1,000,000 shares, of which 210,825 were issued and outstanding. The authorized indebtedness of Metropolitan was $100,000,000, of which bonds in the amount of $41,625,300, were outstanding on April 30, 1935. Of these, $909,400 were held in its treasury.
The petition set forth that, as the purchase price for the franchises and all the property of Northern, Metropolitan proposed to assume all the debts and liabilities of Northern, and pay — subject to adjustment due to operations in the ordinary course of business between April 30, 1935 and the date of closing — $2,532,040.09, of which $1,537,911.80 was to be in cash, and the balance in Associated Electric Company 4 1/2% gold refunding bonds, due 1956, owned by Metropolitan and held in its treasury, at their average cost to Metropolitan or the market price at date of closing, whichever should be greater.
The petition averred that the proposed sale was necessary and proper for the service, accommodation and convenience of the public for the following reasons:
(a) The petitioners were affiliated companies and *Page 183 
for some time past had been under the same management.
(b) The combination of petitioners' properties and corporate organizations into one operating unit would result in the elimination of existing duplication and make for increased efficiency and economy in operation.
(c) Metropolitan was in better position to furnish improvements and extensions to property now owned by Northern, which would become necessary, and expected to be able to refund advantageously certain of Northern's securities now issued and outstanding.
(d) Metropolitan was possessed of large steam generating plants and a large high tension electric transmission system, interconnected with similar systems and plants of other operating public utility companies, whereas Northern had but a few generating plants of limited capacity, although interconnected by a high tension electric transmission system with other operating public utility companies and it was contemplated that the existing systems of the two petitioners, on the consummation of the proposed sale, would be either directly or indirectly connected with each other, with resultant economies and improvement to the reliability of the service rendered by the systems of each.
At the hearing which followed it was developed that all the common stock of both companies was owned by NYPANJ Utilities Company, formerly known as Metropolitan Edison Corporation. Northern secured most of its supply of electricity from New York State Electric Gas Corporation, a New York affiliated company, a small amount from non-affiliated companies, and generated the balance in one small steam plant and four small hydro-electric plants — the proportions used in 1934 being, (1) purchased from affiliated companies along New York State line, about 85%; (2) purchased from non-affiliates in Pennsylvania about 2.3%; (3) *Page 184 
generated in its own plants, about 12.7%. The kilowatt hours of electricity disposed of in 1934 amounted to 32,708,610. Metropolitan has steam plants at Middletown, Reading and Easton, and a hydro-electric plant on the Susquehanna River below Harrisburg. A portion of its supply is purchased from New Jersey Power Light Company, a New Jersey affiliate owned by NYPANJ, and it has connections for interchanging power with Pennsylvania Power Light Company, Pennsylvania Water Power Company and Philadelphia Electric Company. The total kilowatt hours disposed of in 1934 were 461,175,758, obtained roughly in the following proportions: (1) Purchased, 3%; (2) received under interchange agreements, 37.6%; (3) generated in its own plants, 59.4%.
On September 21, 1936 the Public Service Commission filed its order denying approval of the proposed sale. The accompanying report discussed the matter fully. It found fault with the balance sheet of Northern, the purchase price agreed upon, the use of $1,537,911 cash, which had been ordered by the Commission to be maintained as a separate fund for the payment of the cost of net additions, found that the respective areas of the petitioners were widely separated and not adapted for combining into one composite service area, and expressed doubt as to the advantages to be derived from the same and reflected in any rate reduction to the consuming public.
On October 6, 1936 the applicants filed a petition for a rehearing and on October 22, 1936 filed an amendment to their application agreeing to comply with the suggestions of the Commission as to the purchase price and that payment of the latter should be made by a transfer on the books of Metropolitan to its capital surplus or its stated capital for common stock. In the petition for rehearing, applicants also called attention to the Act of Congress, known as the "Public Utility *Page 185 
Act of 1935," approved August 26, 1935, and that Title II thereof, referred to as the "Federal Power Act," relates to the regulation of electric utility companies engaged in interstate commerce, and specifically cited section 203(a) of Part II of the Federal Power Act, and averred that the enactment of the Federal Power Act constituted the occupation of the field of regulation of such public utilities engaged in interstate commerce by the Congress, through its duly constituted agency, the Federal Power Commission; and that as a result of the exercise by Congress of its jurisdiction pursuant to Art. I, sec. 8 of the Constitution of the United States and the assumption of jurisdiction over the petitioners, the jurisdiction, power and authority of the Public Service Commission in the pending matter had ceased and terminated, and that the Public Service Commission was without jurisdiction, power and authority in the premises. But petitioners did not ask to withdraw the application; on the contrary they asked to amend the application as above set forth.
On November 9, 1936 the Commission refused a rehearing, and the petitioners appealed to this court to No. 24 March Term 1937.
In the meantime (October 16, 1936) the appellants had filed with the Federal Power Commission a petition for the approval of the proposed sale under the provisions of the Federal Power Act aforesaid (Act of June 10, 1920, c. 285, sec. 203(a), as added August 26, 1935, c. 687, Title II, sec. 213, 49 Stat. 849,16 U.S.C.A. sec. 824 et seq., particularly sec. 824b) which was at first denied; but later, on November 20, 1936, upon the amended basis suggested as aforesaid, to wit, that no cash or securities would be paid out by Metropolitan, the Federal Commission issued an order giving its approval of said sale.
In January, 1937 the Public Service Commission, the appellants concurring, requested this court to remit the *Page 186 
record for further consideration and action. This was done and the record was returned to the Commission where it was again considered. On March 9, 1937 the Commission again refused to grant a certificate of public convenience evidencing their approval of the sale, three commissioners out of seven dissenting. On March 31, 1937, an act, effective upon its final enactment, was passed and approved (P.L. 160), which abolished the Public Service Commission as of that date and created in its place the Pennsylvania Public Utility Commission, composed of five members, and provided that all proceedings pending before the Public Service Commission should continue and remain in full force and effect as if the Public Service Commission had not been abolished, and might be completed by the Pennsylvania Public Utility Commission; and that pending litigation or proceedings before any State or Federal Court or regulatory body instituted by or against the Public Service Commission or in which such commission was a party on the effective date of the Act should not be affected by the Act but the Pennsylvania Public Utility Commission should be substituted in such litigation or proceedings for the Public Service Commission. The Public Utility Commission operated under the Public Service Company Law of 1913, P.L. 1374, and its amendments and supplements, from April 1, 1937 until June 1, 1937, when it was repealed and superseded by the Public Utility Law of May 28, 1937, P.L. 1053, which on June 1, 1937 became the statutory law to be administered by the Public Utility Commission.
On April 2, 1937 the applicants filed with the Public Utility Commission another petition for rehearing and reconsideration. This was granted and on June 8, 1937 a further hearing was held. On August 16, 1937 the Public Utility Commission entered a unanimous report and order denying the application, from which the applicants *Page 187 
appealed to this Court to No. 20 March Term, 1938. The appeals have, by agreement, been consolidated and were argued together.
We shall consider the specifications of error under three heads.
1. Appellants claim that the Federal Power Act, supra, vested jurisdiction over the sale of Northern to Metropolitan — both being companies engaged in interstate business, — in the Federal Power Commission, and that the action of that Commission in approving the sale as consistent with the public interest, in accordance with the provisions of the Federal Power Act, deprived the Pennsylvania Public Utility Commission of jurisdiction or authority to withhold or refuse approval. If this contention is allowed, we need go no further; but, in our opinion, it is not tenable.
No one disputes that if Congress has assumed full jurisdiction over the subject, and fully occupied the field of regulation of public utilities transmitting and selling electric energy, the jurisdiction and authority of the Pennsylvania Public Utility Commission in the premises is thereby displaced and superseded, but the Commission contends, and we agree with them, that such is not the case here. Section 201(a) of the Act of August 26, 1935 (16 U.S.C.A. sec. 824(a)), which is entitled, "Declaration of policy," declares that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, "and that Federal regulation of matters relating to generation to the extent provided in this Part [Part II] and the Part [III] next following and of that partof such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy atwholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only tothose matters which are not subject to regulation by the States."
(Italics supplied.) *Page 188 
Paragraph (b) of the same section provides that the provisions of this Part shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy atwholesale in interstate commerce, "but shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The [Federal Power] Commission shall have jurisdiction over all facilities for such transmission or sale [that is, sale at wholesale] of electric energy, but shall not have jurisdiction, except as specifically provided in this Part [II] and the Part next following [III] over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter."
By paragraph (d), it is provided that "The term `sale of electric energy at wholesale' when used in this Part [II] means a sale of electric energy to any person for resale."
We do not agree with the learned counsel for appellants that the next section, 202, (16 U.S.C.A. sec. 824a) is designed to encourage and promote the merger and consolidation of public utilities generating, transmitting or selling electric energy. For the purpose of assuring an abundant supply of electric energy throughout the United States with the greatest possible economy and with regard to the proper utilization and conservation of natural resources, the Federal Power Commission is empowered and directed to divide the country into regional districts for thevoluntary interconnection and coordination of facilities for thegeneration, transmission and sale of electric energy, and it may, also, upon its own motion or upon application, make *Page 189 
such modifications thereof as in its judgment will promote the public interest, and require such interconnection of facilitiesand interchange of energy. There is not one provision in the entire section which deals with the merger or consolidation of public utilities generating, transmitting or selling electric energy. The section deals with the interconnection of facilities, voluntary or compulsory, and the like interchange of electric energy between public utilities, — a wholly different matter. For example the Public Service Company Law and the Public Utility Company Law of this Commonwealth make provision for the interconnection and interchange of service of railroad companies and telegraph companies respectively, and yet the Constitution (Art. XVII, sec. 4, and Art. XVI, sec. 12) expressly prohibits the consolidation of railroad corporations or telegraph companies.
The provisions of the Federal Power Act relative to consolidation are contained in section 203 (16 U.S.C.A. sec. 824b), which provides that no public utility shall sell, lease orotherwise dispose of the whole of its facilities, subject to the jurisdiction of the [Federal Power] Commission, (as before limited), or any part thereof of a value in excess of $50,000, or by any means, directly or indirectly, merge or consolidate such facilities or any part thereof, with those of any other person,or purchase, acquire or take any security of any other publicutility, without first having secured an order of the [Federal Power] Commission authorizing it to do so. It provides for a hearing of the application for such approval, of which notice in writing is to be given to the Governor and the State commission of each of the States in which the physical property affected, or any part thereof, is situated, and to such other persons as it may deem advisable; and if after opportunity for hearing the Commission finds that the proposed disposition, consolidation, acquisition or control will be *Page 190 
consistent with the public interest, it shall approve the same. The immediately following paragraph, that the [Federal Power] Commission may grant such application in whole or in part, and upon such terms and conditions as it finds necessary or appropriate to secure the maintenance of adequate service and thecoordination in the public interest of facilities subject to thejurisdiction of the Commission, shows the scope of the Federal Power Commission's inquiry and that it must be satisfied that the consolidation, sale, acquisition of securities, etc., does not conflict with the main purpose underlying the enactment of the Federal Power Act, and that the public interest in the transmission and sale of electric energy at wholesale in interstate commerce would not be adversely affected by the proposed action. A reading of the entire section in connection with the declaration of policy and the previous provisions limiting the jurisdiction of the Federal Power Commission and subsequent sections of the act, makes it clear that it was not intended to take from the State commissions, which had always had jurisdiction over the merger and consolidation of public utilities, the sale of their franchises and properties, and the acquisition by one public utility of the securities of another, the power and authority to regulate these vitally important matters which affect the generation of electric energy and its local distribution, and the supervision of which is necessary for the protection of the local consuming public, and place them wholly under the jurisdiction and authority of the Federal Power Commission. Sec. 201(a) distinctly negatives this contention. Section 203 qualifies the power and authority previously existing in the State commissions to approve such consolidations, sales of franchises, property, etc. and the acquisition of securities of other public utilities, by adding the further requirement that before such consolidations, sales, acquisition of securities, etc., can be effected, with respect *Page 191 
to public utilities coming under the jurisdiction of the Federal Power Commission, there must be secured from the Federal Power Commission, (in addition to any approval required under the State law), a certificate of public convenience evidencing its approval that the proposed action is not opposed to the public interest as stated and declared in the Federal Power Act. The section has no effect on the dominant power of the Federal Power Commission to order or approve any interconnection of facilities or interchangeof energy found by it to be necessary for the general public interest, as provided for in section 202 of the Federal Power Act. The section relating to consolidations and sales of property and franchises is bound up with the purchase, acquiring or taking of the securities of any other public utility, and it will scarcely be contended that supervision and regulation of this latter matter, necessary for the protection of the local consuming public, has been wholly removed from the State commissions and lodged in the Federal Power Commission by section 203.
Subsequent sections of the Federal Power Act give the Federal Power Commission jurisdiction, (1) over the issuance of securities and assumption of liabilities by public utilities (sec. 204, 16 U.S.C.A. sec. 824c) with a proviso that it shall not extend to a public utility organized and operating in a State, under the laws of which its security issues are regulated by a State commission; (2) over all rates and charges made, demanded or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission (secs. 205 206,16 U.S.C.A. secs. 824d 824e); (3) it is authorized on complaint of a State commission to compel the furnishing of adequate interstate service by a public utility (sec. 207, 16 U.S.C.A. sec. 824f); (4) it may investigate and ascertain the actual legitimate cost of the property *Page 192 
of a public utility, the depreciation therein, when necessary for rate making purposes and other facts bearing on the fair value of the property, and may require an inventory of the property and a statement of the original cost and of all additions, betterments, extensions and new construction to be filed with it (sec. 208,16 U.S.C.A. sec. 824g); and section 209, 16 U.S.C.A. 824h, provides for a conference between the Federal Power Commission and any State Commission regarding the relationship between rate structures, costs, accounts, charges, practices, classification of public utilities subject to the jurisdiction of such StateCommission and of the Federal Power Commission and for the furnishing by the Federal Commission to the State Commission of such information and reports as may be of assistance in Stateregulation of public utilities; thus expressly recognizing the continued regulatory powers of the State Commissions and the desirability for cooperative action. We agree with the Public Utility Commission that it is not the design of the Federal Power Act, Part II, that the Federal Power Commission should regulate local rates or local services of public utility companies; full control over them is specifically left to the States. It makes provision for the interconnection and coordination of facilities for the generation, transmission and sale of electric energy, prohibits the sale or other disposition by a public utility of its facilities, subject to the jurisdiction of the Commission, or the merger or consolidation of such facilities, or the purchase or acquisition by a public utility of the securities of any other public utility, without the consent and approval of the Commission first obtained. Section 824(e) provides that the Commission may fix rates and charges, and the cost of transmission. A later section confers upon the Commission power to order adequate service. In none of these fields, has the State regulation over electric utilities been superseded by the Federal Power *Page 193 
Act. If the appellants' argument is well-founded, the State Commissions are equally without power as to these matters included in the Federal Power statute. The declaration of policy [sec. 201, 16 U.S.C.A. sec. 824] excludes such conclusions, and it is clearly the purpose of the entire act to regulate only those matters which pertain to the interstate exchange of wholesale power. The Federal Power Act therefore does not prohibit the Commonwealth of Pennsylvania from passing upon the necessity or desirability of mergers of electric utilities selling energy at retail in Pennsylvania, or the sale by one such utility to another of its franchises and all its property, having regard to its effect upon local rates and service and the interests of the consuming public.
The position of the Commission (appellee) is sustained by the following decisions of the Supreme Court of the United States, selected out of many supporting cases: Townsend v. Yeomans,301 U.S. 441, which held that the Tobacco Inspection Act of August 23, 1935, 49 Stat. 731, 7 U.S.C.A. 511 et seq. did not occupy the field of legislation to such an extent as to prevent the State of Georgia from prescribing maximum charges for handling and selling leaf tobacco; Kelly v. Washington, 302 U.S. 1, which held that an act of the State of Washington (c. 200 of Washington Laws of 1907 — Rem. Rev. Stat. sec. 9843 et seq.) providing for the inspection and regulation of vessels, was not superseded or displaced by the Motor Boat Act of Congress (36 Stat. 462; 46 U.S.C.A. sec. 511 et seq.) or other Federal statutes, in so far as such inspection and regulation was not covered by the Federal acts, and that its provisions would be enforced as to motor driven tugs not within the field covered by those acts. The court speaking through Chief Justice HUGHES said: "Under our constitutional system, there necessarily remains to the States, until Congress acts, a wide range for the permissible exercise *Page 194 
of power appropriate to their territorial jurisdiction although interstate commerce may be affected. . . . . . States are thus enabled to deal with local exigencies and to exert in the absence of conflict with federal legislation an essential protective power. And when Congress does exercise its paramount authority, it is obvious that Congress may determine how far its regulation shall go. There is no constitutional rule which compels Congress to occupy the whole field. Congress may circumscribe its regulation and occupy only a limited field. When it does so, state regulation outside that limited field and otherwise admissible is not forbidden or displaced. The principle is thoroughly established that the exercise by the State of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so `direct and positive' that the two acts cannot `be reconciled or consistently stand together.'" [citing cases]; South CarolinaState Highway Department v. Barnwell Bros., 303 U.S. 177, which held that the Act of South Carolina of April 28, 1933, 38 Stat. 340, which prohibits the use on the state highways of motor trucks, etc. whose width exceeds 90 inches and whose weight, including load, exceeds 20,000 pounds, was not superseded by the Federal Motor Carrier Act of 1935, c. 498, 49 Stat. 546,49 U.S.C.A. 304; Lehigh Valley Railroad v. Commissioners,278 U.S. 24, 35, which held that the Transportation Act of 1920 did not deprive the states of the right to make reasonable orders for the abolition of grade crossings; Hartford Accident Indemnity Co.v. Illinois, 298 U.S. 155, 158, which held that the State of Illinois could pass a valid statute requiring commission merchants selling produce, including fresh fruits and vegetables, consigned from outside the state, to procure a state license, etc. notwithstanding the Act of Congress of June 10, 1930, c. 436, 46 Stat. 531, 7 U.S.C.A. secs. 499a-499r, required those *Page 195 
engaged in the business of receiving fresh fruits and vegetables in interstate commerce, for sale on commission, to procure a license from the Secretary of Agriculture, thus covering in part the same ground as the Illinois law, when the federal act expressly declared that state statutes dealing with the same subjects should remain in effect, except in so far as they were inconsistent with it; Carey v. South Dakota, 250 U.S. 118, which held that section 29, Laws of South Dakota, 1909, c. 240, forbidding shipment by carrier of wild ducks, whether taken lawfully or unlawfully, in open or closed season, was not in conflict with the Federal Migratory Bird Act of March 4, 1913, c. 145, 37 Stat. 828, 847, and the regulations of the Department of Agriculture adopted thereunder, since the latter act forbade only the destruction or taking of birds contrary to the regulations, and the regulations merely prescribed the closed seasons, and neither the act nor the regulations dealt with shipping. The declaration of the Federal Act that the migratory birds "shall hereafter be deemed to be within the custody and protection of the Government of the United States" was limited by the context to the prohibition above stated. "In construing federal statutes enacted under the power conferred by the commerce clause of the Constitution the rule is that it should never be held that Congress intends to supersede or suspend the exercise of the reserved powers of a State, even where that may be done, unless, and except so far as, its purpose to do so is clearly manifested." Illinois Central R.R. Co. v. Public Utilities Comm.,245 U.S. 493, 510. See also, Atchison, Topeka Santa Fe Ry. Co.v. Railroad Commission, 283 U.S. 380, 390; Savage v. Jones,225 U.S. 501, 529-540; Atlantic Coast Line Railroad Co. v. Georgia,234 U.S. 280, 293; Mintz v. Baldwin, 289 U.S. 346, 351-352;Chicago, M. St. P. Ry. Co. v. Solan, 169 U.S. 133, 137, 138;Reid v. Colorado, 187 U.S. 137; Cummings v. Chicago, *Page 196 188 U.S. 410; Penna. R. Co. v. Hughes, 191 U.S. 477, 488-491; Crossman v.Lurman, 192 U.S. 189; Asbell v. Kansas, 209 U.S. 251; Missouri P.Ry. v. Larabee Mills, 211 U.S. 612, 621-624.
The cases cited and relied on by the appellants are ones in which the Act of Congress amounted to an exclusive occupation of the field of regulation or in terms superseded the state law previously existing. By the express terms of the Federal Power Act that is not the case here. Two interests are recognized by the Act as being concerned in the regulation of public utilities engaged in the generation, transmission and sale of electric energy, Federal and State. The Federal Commission has to do with the transmission and sale of energy at wholesale in interstate commerce; the State with its generation and local distribution to the retail consumer. For federal purposes, the Federal Power Commission is given control of the interconnection andcoordination of facilities, with a view to assuring an abundant supply of electric energy throughout the United States; but the jurisdiction of the State Commission is expressly reserved over facilities used for the generation of electric energy and over facilities used in its local distribution. The sale or disposal of the facilities of a public utility and the merger or consolidation of such facilities involve a dual interest. Before such action can legally take place the Federal Power Commission must be satisfied that the general plan for the interconnection and coordination of facilities will not be harmed thereby and the public interest in the transmission and sale of electric energy at wholesale in interstate commerce not adversely affected; and the State Commission must be satisfied that the proposed action will not prove injurious to the interests of the local consumer. Both interests must be considered and the approval of both commissions is necessary before the sale or merger can be accomplished. This is due to the fact that the jurisdiction *Page 197 
of the State Commission in this respect, which existed prior to the enactment of the Federal Power Act is not taken away, but is expressly reserved. As respects the sale or merger of facilities, as distinguished from the interconnection and coordination of facilities, the act merely requires the securing of an additional consent or approval, that of the Federal Power Commission, when satisfied that the federal interests will not be jeopardized thereby.
2. Appellants claim that section 202(e) of the Public Utility Act of May 28, 1937, P.L. 1053, which requires a certificate of public convenience from the Public Utility Commission evidencing its approval before any public utility may acquire from or transfer to any person or corporation by any method or device whatsoever (including among other things a consolidation, merger, sale or lease) the title to, or the possession or use of, any tangible or intangible property whatsoever, is unconstitutional as depriving them of their property without due process of law, contrary to the 14th amendment to the Federal Constitution; and that the exempting clause, which provides that the commission may, by regulation, exempt any class of property from the provisions of this paragraph, is unconstitutional and void as an unlawful delegation of legislative power contrary to Art. II, sec. 1, of the Constitution of this Commonwealth.
At the outset we may say that had the Act of 1937, supra, been in force and effect when this application was filed, the appellants would have been precluded from raising this question; for it is settled law that one who invokes an unconstitutional enactment or proceeding is barred from asserting its invalidity:Montgomery County Bar Assn. v. Rinalducci, 329 Pa. 296, 298,197 A. 924; Ashwander v. Tennessee Valley Authority, 297 U.S. 288,348; Electric Co. v. Dow, 166 U.S. 489; St. Louis MalleableCasting Co. v. George C. Prendergast *Page 198 Const. Co., 260 U.S. 469; Wall v. Parrot Silver Copper Co.,244 U.S. 407, 411, 412; Great Falls Mfg. Co. v. Attorney General,124 U.S. 581, 598, 599. But when appellants filed their application for the approval of the proposed sale the state statute in force was the Public Service Company Law of July 26, 1913, P.L. 1374, and the Federal Power Act of August 26, 1935 had not been enacted. The subsequent passage of the Public Utility Law of May 28, 1937, P.L. 1053, which repealed and superseded the Public Service Company Law of 1913, while appellants' application was pending, did not estop or bar them from asserting the unconstitutionality of provisions of the superseding act sought to be applied by the Public Utility Commission.
The relevant provision of the Public Service Company Law of 1913 under which the application was filed was:
"Article III, Section 3. Upon like approval of the commission first had and obtained, as aforesaid, and upon compliance with existing laws, and not otherwise, it shall be lawful —. . . . ..
(c). For any public service company to sell, assign, transfer, lease, consolidate, or merge its property, powers, franchises, or privileges, or any of them, to or with any other corporation or person." The appellants admit the constitutionality of this provision and recognize its applicability to the proposed sale, when the petition for approval was filed.
The corresponding relevant provision of the Public Utility Law of 1937 is as follows:
"Article II, Section 202. Enumeration of Acts Requiring Certificate. — Upon approval of the commission, evidenced by its certificate of public convenience first had and obtained, and upon compliance with existing laws, and not otherwise, it shall be lawful: . . . . . .
(e) For any public utility to . . . . . . acquire from, or transfer to, any person or corporation, including a *Page 199 
municipal corporation, by any method or device whatsoever (including among other things a consolidation, merger, sale or lease) the title to, or the possession or use of, any tangible or intangible property whatsoever: Provided, however, That the commission may, by regulation, exempt . . . . . . any class of property from the provisions of this paragraph."
This provision appellants attack as unconstitutional for the reasons set forth at the beginning of this heading.
We are of opinion that, considered by itself, there is merit in the contention. Literally enforced, it would deprive appellants, which are corporations duly chartered and empowered to transact business, of the right or authority to buy or sell the least thing or article needed in the ordinary conduct of their business, a postage stamp, a sheet of paper or a lead pencil, — whether it had any relation to their duty, power or ability to supply adequate service to the public at fair and reasonable and non-discriminatory rates, or not —, unless they first obtained from the Public Utility Commission a certificate of public convenience evidencing its approval of such purchase or sale. The literal enforcement of such a provision would not be lawful supervision or regulation of a public utility in the interest of the public, but would amount to a seizure of the control and management of the corporation, and the taking over of its business without due compensation or due process of law. This the legislature has no power to do. Under the police power, through its agent, the Public Utility Commission, it may reasonably supervise and regulate the business of public utility companies, with the purpose of securing to the public adequate service at fair and reasonable rates, but it may not lawfully interfere with the management and control of the corporation beyond what is reasonably necessary for that object. Coplay Cement Co. v.P.S.C., 271 Pa. 58, 61, 62, *Page 200 114 A. 649; Southwestern Bell Tel. Co. v. P.S.C., 262 U.S. 276, 289;Interstate Commerce Comm. v. Chicago G.W. Ry. Co., 209 U.S. 108,118; Interstate Commerce Comm. v. Ala. Mid. R.R. Co.,168 U.S. 144, 172; Chambersburg Gas Co. v. P.S.C., 116 Pa. Super. 196,227, 176 A. 794; Chicago, M. St. P.R. Co. v. Wisconsin,238 U.S. 491, 501; "It must never be forgotten that while the State may regulate with a view to enforcing reasonable rates and charges, it is not the owner of the property of public utility companies and it is not clothed with the general power of management incident to ownership": Southwestern Bell Tel. Co. v.P.S.C., supra, p. 289. The provision complained of goes beyond any power conferred by any similar statutory clause which has been sustained as constitutional, that has been brought to our attention. In the Federal Power Act, supra, the corresponding provision (sec. 203 (a)) is, "No public utility shall sell, lease or otherwise dispose of the whole of its facilities, subject to the jurisdiction of the Commission, or any part thereof of a value in excess of $50,000 or by any means whatsoever, merge or consolidate such facilities or any part thereof with those of any other person, without first having secured an order of the Commission authorizing it to do so." The New Jersey Public Utilities Act, Chapter 195, Laws of 1911, cited by the Commission, provides:
"Section 18(h). No public utility as herein defined shall: Without the approval of the board sell, lease, mortgage, or otherwise dispose of or encumber its property, franchises, privileges or rights, or any part thereof, nor merge or consolidate its property, franchises, privileges or rights, or any part thereof, with that of any other public utility as herein defined. Every sale, lease, mortgage, disposition, encumbrance, merger or consolidation made in violation of any of the provisions hereof shall be void and of no effect. Nothing hereincontained shall be construed in any wise to prevent the *Page 201 sale, lease or other disposition by any public utility as hereindefined of any of its property in the ordinary course of itsbusiness." The foregoing words italicized by us, take out of this provision the sale, lease, or other disposition by a public utility company of its property in the ordinary course of its business, and leave the clause unobjectionable in this respect. Thus limited it is not essentially different from the provision in the old Pennsylvania Public Service Company Law, above-quoted, which the appellants admitted was constitutional. See ReliefElec. Lt., Heat Power Company's Petition, 63 Pa. Super. 1
(KEPHART, J.).
The invalidity of the provision under consideration is not cured by the added clause, "Provided, however, That the commission may, by regulation, exempt . . . . . . any class of property from the provisions of this paragraph." The legislature declared no policy, established no standard, laid down no rule, to govern the Commission in formulating the regulation or regulations under which "any class of property" would be exempted from the general clause denying to any public utility company the right "to acquire from, or transfer to, any person or corporation . . . . . . by any method or device whatsoever (including among other things a consolidation, merger, sale or lease) the title to, or the possession or use of, any tangible or intangible property whatsoever." "There is no requirement, no definition of circumstances and conditions," (Panama Refining Co. v. Ryan,293 U.S. 388, 430,) in which the purchase or sale of any property is to be allowed or prohibited; no norm nor standard by which any class of property exempted from its provisions is to be determined. The whole matter of exemption is left to the arbitrary will of the commission controlled by no chart or compass. Because of this, the cases relied on by counsel for the commission (Gima v. Hudson Coal Co., 310 Pa. 480, 165 A. 850;Rohrer v. Milk Control Board, 322 Pa. 257, 186 A. 336 et al.) do *Page 202 
not apply. The case, in this respect, falls squarely within the rulings of the United States Supreme Court in Panama Refining Co.v. Ryan, 293 U.S. 388 and Schechter v. United States,295 U.S. 495, and of the Supreme Court of Pennsylvania in Holgate Bros. v.Bashore, 131 Pa. 255, 200 A. 672, and York Railways Co. v.Driscoll, 331 Pa. 193, 200 A. 864.
But it does not follow, because the legislature went too far in section 202(e) and attempted to encroach upon the field of the general control and management of public utility companies, that all regulation over the sale by a public utility company of its franchises and property to another company, or the corresponding purchase by a public utility company of the franchises and property of another company, is thereby invalidated. There are evidences in other sections of the Public Utility Company Act, as well as in Section 202, of an apparent intent to enlarge the domain of the Public Utility Commission beyond the lawful supervision and regulation of utilities provided for by the Public Service Company Act of 1913, but none of any intent torestrict or limit the field of regulation and supervision provided for by that Act. The Public Utility Company Act of 1937 provides in section 1403, "Severability. — It is hereby declared that the provisions of this act are severable one from another . . . . . . and if for any reason one or more of such provisions be judicially held to be unconstitutional . . . . . . in anywise for any reason, such holding or decision shall not affect the validity . . . . . . of the remaining provisions of this act. It is hereby declared that such provision, and the remaining provisions, would have been enacted, notwithstanding such judicial determination of the invalidity of any of such particular provision or provisions in any respect." Our Supreme Court has ruled that if part of a statute, which is unconstitutional in its operation, is independent of and separable from that which is constitutional, so that *Page 203 
the latter may stand by itself, the part which is constitutional may be sustained and enforced, even though the unconstitutionalprovisions be contained in the same section: Rothermel v.Meyerle, 136 Pa. 250, 265, 20 A. 583. This was followed and approved in the very recent case of Rutenberg v. Phila., 329 Pa. 26,39, 196 A. 73, where the "1937 Magistrates' Court Act" (June 15, 1937, P.L. 1743) was under consideration and the sections relating to the criminal jurisdiction of the magistrates' courts were held constitutional and those which attempted to set up a "civil division" were held unconstitutional, and as to sections 33 and 34, in so far as they related to the criminal jurisdiction vested in the magistrates and to the civil jurisdictiontheretofore vested in them, they were held valid, and beyond that were not sustained. See also, Blauner's Inc. et al. v. Phila.,330 Pa. 340, 198 A. 889. In the Statutory Construction Act. of May 28, 1937, P.L. 1019, it is provided in section 51: "When the words of a law are not explicit, the intention of the Legislature may be ascertained by considering, among other matters — (1) the occasion and necessity for the law; (2) the circumstances under which it was enacted; (3) the mischief to be remedied; (4) the object to be attained; (5) the former law, if any, includingother laws upon the same or similar subjects; (6) the consequences of a particular interpretation; (7) the contemporaneous legislative history; and (8) legislative and administrative interpretations of such law," (p. 1024). And in section 52: "In ascertaining the intention of the Legislature in the enactment of a law, the courts may be guided by the following presumptions among others: (1) That the Legislature does not intend a result that is absurd, impossible of execution or unreasonable; . . . . . . (3) That the Legislature does not intend to violate the Constitution of the United States or of this Commonwealth; . . . . . . (5) That the Legislature intends to *Page 204 
favor the public interest as against any private interest." Supervision and regulation of the acquisition, or sale, of the franchises and property of one public utility company by, or to, another are so vitally important in the public interest, having regard to the utility's ability to provide adequate service and the fair and reasonable charges to the public for such service, that it should not be held that it was the legislative intent wholly to forego such supervision and regulation merely because of an abortive attempt to broaden the field and include control over all transfers of any tangible or intangible property whatsoever, irrespective of whether they reasonably tended to affect the facilities and service to be supplied the public and the fair and reasonable rates to be charged therefor. Certainly the new act shows no intent to narrow or restrict the field of supervision and regulation provided in this respect by the Act of 1913. See West v. Lysle, 302 Pa. 147, 151, 153 A. 131. "A construction must be adopted that will make effective the legislative intent": Teachers' Tenure Act Cases, 329 Pa. 213,235, 197 A. 344. We accordingly hold that the provisions of section 202 relative to the requirement of a certificate of public convenience evidencing the approval of the commission before any public utility company may acquire or transfer the property or franchises — that is, "the tangible or intangible property" — of another public utility company will not be extended beyond the provisions of Art. III, sec. 3, of the Public Service Company Law of 1913, nor, on the other hand, construed so as to deprive the commission of the supervision and regulation over such acquisitions and transfers — whether by sale or merger — which were granted the regulatory body by that act. The net result of our ruling is that section 202 of the Public Utility Act of 1937 will be construed as continuing in force the law on the subject of the sale, lease, consolidation or merger by a public utility *Page 205 
company of its property, powers, franchises or privileges, or any of them, to or with any other corporation or person, as it was established in the Public Service Company Act of 1913.
(3) Finally, appellants contend that the findings and determination upon which the commission based its order of denial were arbitrary, capricious and unsupported by the evidence.
The order deals with an administrative matter, which this court may not disturb unless it is clearly shown to be without support in the evidence, or so arbitrary, capricious and unreasonable as to amount to error of law, or a violation of constitutional rights (sec. 1107). The criterion by which the commission is to be guided in its determination is not whether the proposed sale will be in the interest of the utility company or companies, but whether it is necessary or proper for the service, accommodation, convenience and safety of the public. They are not always identical.
Two of the grounds for refusal of the certificate originally presented by the commission, — (1) the amount of the purchase price, and (2) the moving of current assets from the treasury of Metropolitan to its holding company, NYPANJ Utilities Company — have been eliminated by subsequent amendments, but, in the judgment of the commission, the fatal and insurmountable objection still remains that the territories of the applicant companies are not physically connected, are not contiguous and are so different in character as not to be susceptible of rate unification; and, in consequence, the commission was not satisfied that the interests of the public would be served by the sale or merger.
We shall not unnecessarily extend the length of this already too long opinion by stating in full the matters relied on by the commission as the basis for its action. The opinion covers twenty-two pages and shows a full and thorough treatment of the subject. But some circumstances *Page 206 
must be stated for a proper comprehension of the point involved. Northern serves 21,000 consumers in nine counties in the northeastern part of Pennsylvania, extending from Potter County to Wayne County and from the New York State line south nearly as far as Williamsport. Its territorial area is almost twice that served by Metropolitan, which has 106,000 consumers in fourteen counties in the eastern and southeastern parts of Pennsylvania, (excluding Philadelphia, Chester and Delaware Counties), extending from Adams County on the Maryland State line eastwardly to Bucks County and northeastwardly to Pike County. The areas are separated by thirty-two miles on the eastern boundaries and over one hundred miles on the western. The gross operating income derived from Northern's 21,000 consumers in 1934 was $1,400,000, or an average of about $66 2/3 per year. Metropolitan's gross operating income from its 106,000 consumers was $10,800,000, or an average of about $103 per year. Northern's territory is for the most part rural and sparsely settled; Metropolitan's is urban and rather thickly settled. The net annual income of Northern as shown in the exhibits attached to the petition was $131,447; that of Metropolitan $3,077,603. Most of Northern's electric energy is secured from a New York State affiliate under a contract which does not expire until 1945. The proposed connecting line which Metropolitan would build at a cost of $750,000 would not be to Northern's line, but to New York State Electric Gas Company's property at Binghamton, N.Y., and the energy received by that company would be credited against the energy delivered by it to Northern; but there would be no direct interconnection between Metropolitan and Northern and the future assurance of available energy in Northern territory would remain dependent on New York State Electric Gas Company's supply. The two companies will therefore remain noncontiguous *Page 207 
and there will not be a consolidation of facilities available for local service to consumers, which is ordinarily a beneficial result of merger. As was said in the opinion: "In conclusion the record clearly shows that it is not proposed to interconnect the respective areas of the two companies, but that the areas will be operated separately; that of Metropolitan Company to be served with power generated in its own plants and that of Northern Company to be served with power purchased from its affiliate, New York State Electric and Gas Corporation. Were the merger approved the areas would continue to be operated as at present but under single management which, however, is the effect today since both companies are wholly owned by NYPANJ Utilities Company. If the bonds of Northern Company were refinanced with bonds of Metropolitan Company at a lower interest cost, such benefit would accrue only to the common stockholders (NYPANJ Utilities Company), and in no way redound to the benefit of the rate payer. Any economies of operation which might result, however, would be inconsequential and have no material effect upon rates. The merger is not required to bring about the simplification of the Northern Company rates, nor to effect the suggested reduction in rates for rural lines, since if such reduction could be made after the merger is consummated it could be made now. Were the merger consummated and an attempt made to keep separate the costs of operation in the respective areas, the record shows that such separation would be based on assumptions, so that any desired result of allocation could be obtained, and regulation and determination of proper rates by us in the two areas would be rendered impossible."
The commission was of opinion that, in the circumstances above mentioned, if a merger was approved between these two non-connecting and non-contiguous companies and a unified system of accounts was set up, *Page 208 
it would be impossible accurately to separate the expenses chargeable to Northern from those chargeable to Metropolitan, to the resulting detriment of consumers in the Metropolitan area; and if separate sets of accounts were set up, segregating these items, as was suggested would be done, one of the savings which was to be expected from the merger would be lost, and nothing gained in that respect over the present control of both companies by one holding company — and, if done, the allocation of costs would be within the arbitrary action of the holding company, and difficult, if not impossible, of supervision by the commission. See, in this connection, Federal Power Commission v. MetropolitanEdison Co., Northern Penna. Power Co. et al., 304 U.S. 375.
Without going further into details, we are of opinion that the conclusion of the commission is not unsupported by evidence and that appellants have failed to establish that the order appealed from is capricious and arbitrary and so unreasonable as to amount to error of law.
The appeals are dismissed and the order of the commission is affirmed at the costs of the appellants.