**PENNSYLVANIA WATER & POWER CO. et al. v. CONSOLIDATED GAS, ELECTRIC LIGHT & POWER CO. of Baltimore (PUBLIC SERVICE COMMISSION OF MARYLAND, Intervener).**

No. 6102.

United States Court of Appeals
Fourth Circuit.

Argued June 26, 1950.

Decided Sept. 30, 1950.

Writ of Certiorari Denied Dec. 11, 1950.

See 71 S.Ct. 282.

554

**SOPER, Circuit Judge.**

The subject matter of this suit is a wholesale electric power agreement between Consolidated Gas, Electric Light & Power Company of Baltimore, a Maryland utility corporation, and Pennsylvania Water & Power Company, a Pennsylvania utility corporation. Penn Water seeks a declaratory judgment that the agreement is not a valid contract principally on the grounds that it violates the federal anti-trust laws and is contrary to the public policy and the laws of Pennsylvania.

Differences between the parties led Consolidated on September 1, 1948 to invoke arbitration provisions contained in Article X of the contract. Shortly thereafter, Penn Water instituted this suit and asked the court to declare that Article X is unenforceable, and to enjoin Consolidated from proceeding with the arbitration. During the course of the proceeding, Penn Water notified Consolidated that it had terminated the agreement because of breaches on the part of Consolidated, and filed an amended complaint asking that the agreement be struck down in its entirety and also that the arbitration be enjoined.

Penn Water notified Consolidated that it would immediately cease to receive from Consolidated and pay for any electric energy generated in Maryland or the District of Columbia and transmitted to Pennsylvania, and that its operations would be changed to effect this purpose. It declared that it would receive energy via its transmission lines for the limited purpose of delivery to the Pennsylvania Railroad; and announced that these changes would have no effect on the amount of electrical services rendered by Penn Water to Consolidated. Thereupon Consolidated applied to the court for a restraining order and on February 9, 1949 the court restrained Penn Water, pending the final determination of the issues, from doing anything in respect to the generation, transmission and disposition of power covered by the agreement between the parties in any manner different from the procedure theretofore followed in the performance of the contract. Thereafter Consolidated answered the amended complaint denying that the agreement is invalid for any reason, or that it had broken the agreement in any way, and asserted that the alleged breaches were proper subjects of arbitration under the contract.

The attorney for the Public Service Commission of Maryland was granted leave to appear on behalf of the Commission as intervener, and filed an explanatory statement of its position in support of Consolidated. The Pennsylvania Public Utility Commission intervened and charged that the contract between the two utilities is invalid because it constitutes a surrender of the powers and franchises of Penn Water to Consolidated without the approval of the Commission.

The court held that the contract was valid and that the parties should proceed to arbitration and continue the restraining order in effect until the decision of this court on appeal.

Penn Water is a Pennsylvania utility corporation which was incorporated in 1910. It is the owner of hydro and steam electrical generating plants, capable of producing 104,000 kilowatts and 30,000 kilowatts respectively, at Holtwood, Pennsylvania, on the Susquehanna River. It also owns transmission lines, including those owned by its subsidiary, Susquehanna Transmission Company of Maryland, which connect with other utilities in Pennsyl-

vania, Maryland and the District of Columbia. The area between the Potomac River on the southwest and the Hudson River on the northeast and south of the Pennsylvania-New York State line is interlaced with electric transmission lines connecting various utility systems. Penn Water's lines are interconnected with these systems which include the systems of Consolidated in Maryland and the Potomac Electric Power Company in the District of Columbia.

In 1910 Penn Water built two transmission lines from Holtwood to Baltimore, and subsequently added various other lines. Today there are in addition a transmission line running northeasterly from Holtwood to Coatesville for the supply of power to the Chester Valley Electric Company, now merged with the Philadelphia Electric Company; a transmission line running northwesterly from Holtwood to York to supply power to the Edison Light & Power Company; a transmission line from the hydroelectric plant of the Safe Harbor Water Power Corporation [1] at Safe Harbor on the Susquehanna, ten miles above Holtwood, to the western part of Baltimore; and a transmission line from Safe Harbor to the eastern part of Baltimore; an extension of the westerly one of these lines from Ellicott City, Maryland, to a point near the District of Columbia, to supply Potomac Electric, which serves the District of Columbia; and a transmission line from Safe Harbor to Perryville, Maryland, along the eastern shore of the Susquehanna River which supplies power to the Pennsylvania Railroad at Perryville. That portion of these lines which is in Maryland is owned by the Susquehanna Transmission Company of Maryland.

Penn Water sells its electric energy and services in bulk to five customers. It has a contract with Metropolitan Edison Company, which operates in the central and eastern part of Pennsylvania; a contract under which it supplies electric services to the Philadelphia Electric Company at Coatesville, which serves an area around Chester, Pennsylvania; a contract with Pennsylvania Power & Light Company for the supply of power in the Lancaster territory extending from the Maryland line north to Harrisburg and eastward to Reading. These three public utility companies are the Pennsylvania customers of Penn Water. In addition Penn Water has a contract with Consolidated to supply power and energy over transmission lines to Baltimore, and also in connection with another contract to the Pennsylvania Railroad. Most of the energy supplied to the Railroad is delivered from Safe Harbor to Perryville, but there is another source of supply to the Railroad in Washington. It will be seen that the greater part of the energy produced by Penn Water is sold at wholesale to four customers, while the remaining portion is sold at retail to the Pennsylvania Railroad as a consumer.

Prior to entering into the agreement in suit, Penn Water sold electricity at retail to the street system of Baltimore, which is now a customer of Consolidated; and also to an electric furnace company in Baltimore. The lines of Penn Water connect directly with those of Potomac Electric and it could sell and deliver electric power directly to Potomac Electric if it were not for its contract with Consolidated which now buys electric power from Penn Water and resells it to Potomac Electric.

Penn Water, in order to supplement its own supply of energy, buys energy generated by Consolidated, Metropolitan Edison, Pennsylvania Power & Light, and Philadelphia Electric for resale, and also buys through Consolidated energy generated by Potomac Electric.

Consolidated has four large steam generating plants with a capacity of 538,000 kilowatts and distribution facilities in and around Baltimore, and also has extensive transmission lines which connect with Penn Water's network of transmission lines and with the Bethlehem Steel Company's electric generating plant in the Baltimore area.

It thus appears that both Penn Water and Consolidated are engaged in the generation, transmission and sale of electric

1. This plant was built and is controlled by Consolidated and Penn Water.

power and energy. Both companies have charter rights for the sale of electric energy to the public at wholesale or retail. Penn Water's charter rights are derived from the State of Pennsylvania, insofar as its lines in that state are concerned, and through the Susquehanna Transmission Company in Maryland it has similar charter rights to operate in Maryland. Consolidated has similar charter rights for the purchase and sale of electric energy in Maryland.

If it were not for the agreement between the parties which is the subject of this suit, the parties would be potential competitors in the generation and sale of electric energy through their present facilities or other facilities that might be constructed; and would also be potential competitors in the purchase of power from others for resale. The power required by Potomac Electric to supply the wants of consumers in the District of Columbia could be purchased by Potomac Electric either from Consolidated or Penn Water and could be supplied by their present facilities or additional facilities that might be built, or by purchases from others. Similarly, Penn Water and Consolidated would be potential competitors for the supply of electric energy in and around Baltimore at wholesale or retail to customers with their present lines or an extension thereof to be approved by the public authorities.

The electric power which is now distributed in and near Coatesville, Pennsylvania, by Philadelphia Electric could be supplied from the facilities now owned or additional facilities to be built by Penn Water or could be supplied from the facilities of Consolidated.

Similarly, Penn Water and Consolidated would be potential competitors with respect to energy taken from Penn Water by Metropolitan Edison and Pennsylvania Fuel & Light which is used in York and Lancaster areas.

Penn Water and Consolidated would be potential competitors for the sale of power to Potomac Edison at Frederick, Maryland, whose lines at that point are only a short distance from the lines of Penn Water so that they could easily be connected.

Free and unrestricted competition between the two utilities is, however, impossible by reason of their contractual relations. The basic agreement between them was made on June 1, 1931. For a number of years prior thereto Penn Water had supplied electricity to Consolidated. On December 31, 1927 the parties entered into an agreement covering the period from January 1, 1927 to December 31, 1970 for the co-operative use of their power resources and the sale of electric energy by Penn Water to Consolidated on a unit rate or calculated value of service basis. Thereafter the two companies cooperated in the financing and construction of a hydro-electric plant at Safe Harbor and on June 1, 1931 entered into two forty-nine year contracts. One of these contracts provided that Penn Water should buy one-third and Consolidated two-thirds of Safe Harbor's output. The other contract is the basic agreement in suit which altered substantially the prior arrangement between the parties. It provided that Consolidated should be entitled to all the electric capacity and energy available to Penn Water from its Holtwood plants and from Safe Harbor and not otherwise disposed of in the performance of existing contracts or new contracts entered into by Penn Water with Consolidated's approval or any obligation imposed upon Penn Water by its charter or by-laws. In return Consolidated agreed to pay to Penn Water an amount equal to the latter's operating expenses, a specified rate of return on existing facilities and a specified rate of return on the cost of new facilities, including an allowance for depreciation; and Consolidated was allowed a credit for the amount of the sales of energy by Penn Water to other persons. This agreement involved the payment by Consolidated of the annual sum of $2,832,259.75 for power and $355,146.73 for depreciation, which represented the revenue received by Penn Water in 1930 under the previous agreement, 10.25% per annum of the cost of plant additions between 1930 and 1938, and 9.5% per annum of the cost of additions after December 31, 1938. This annual payment was reduced by the sum of $600,000 under a supplemental agreement of Septem-

ber 29, 1939, pursuant to the request of the Public Service Commission of Maryland.

When this agreement was executed, Penn Water was receiving more than half of its revenue from consumers other than Consolidated and was selling them 40% of its energy. At the present time, more than 50% of this energy is sold to others than Consolidated and in 1948 Consolidated's payment amounted to less than 12% of Penn Water's operating revenue.

The restrictions which are imposed upon the activity of Penn Water by the agreement and give rise to the contention of invalidity are contained in Articles IV and V as follows:

"Article IV. So far as possible consistently with the performance of any duty or obligation to serve imposed on Power by its charter or otherwise by law, Power shall obtain the approval of Electric before entering into any agreement or agreements with any other person or corporation for the sale and/or purchase and/or interchange of electrical and hydraulic power and energy, or before making any substantial modifications in the existing contracts now in force between Power and its customers other than Electric.

"Article V. So far as possible consistently with the performance of any duty or obligation aforesaid, Power shall obtain the approval of Electric (1) before incurring any single commitment for investment (except for renewals or replacements) in excess of $50,000.00 on the basis of which Electric shall make payment under Article III(b) hereof, and (2) before alienating or disposing of in any one year any property, plant, or equipment, other than stores and construction equipment, having a total value in excess of $50,000.00 and included in the in-

vestments of Power and/or subsidiaries of Power in plant, property or power development devoted to the generation, transmission, or distribution of electrical power and energy." [2]

The basic agreement was not submitted to or approved by the Public Utility Commission of either Pennsylvania or Maryland before its execution. It was made possible by the close relationship between the two utilities, which grew out of the fact that both corporations were controlled by a group of stockholders of whom John E. Aldred, an important figure in the utility field, was the dominating personality. He and his associates acquired control of both corporations in 1910. He became president of both and both continued under his direction until his resignation in 1938. Thereafter the same close cooperation between the two corporations persisted until the retirement in 1946 of the officials who had participated with him in the formulation of his policies; but disagreements subsequently arose which culminated in the present litigation.

The District Judge found and it is not disputed that the effect of the quoted provisions of Articles IV and V of the contract is to confer upon Consolidated the power to control (1) the prices at which Power may sell its product; (2) the extent to which Power may extend its plant; (3) the territory in which Power may sell its product; and (4) the amount of back feed energy which Power must purchase from Consolidated.

We are in agreement with this interpretation of the contract. It expressly forbids plant expansion or development by Penn Water without Consolidated's consent; and also forbids the sale of electric energy by Penn Water without Consolidated's ap-

2. Article VIII of the agreement declares that it is the intent of the parties to encourage the maximum utilization of the resources of the parties by joint use of their property and equipment and by avoiding duplication of investment and unnecessary operating costs. For this purpose it is provided that each party shall appoint one representative to serve on an operating committee to investigate and advise on operating matters and, in case of inability to agree, to submit the ques-

tions in dispute to the presidents of their respective companies.

Article X provides that if any dispute arises between the parties, it shall be referred to a Board of Arbitration consisting of one member to be chosen by each party and the third member to be chosen by the others with further provision for the selection of members of the Board of Arbitration in case of failure to act or disagreement, the determination of the Board to be final and conclusive.

proval, and accordingly empowers Consolidated to fix Penn Water's prices. Hence the effect of the contract was to divide between two large power companies a trade territory wherein they would otherwise have been competitors; and to give one of them the power to fix prices for the other and to forbid plant expansion by the other, however beneficial to the other or to the public interest it might be.

Consolidated has actually exercised its restrictive powers in approving or disapproving Penn Water's contracts and by prohibiting Penn Water's proposals for plant expansion, notably, a proposal by Penn Water in 1948 for plant expansion at Holtwood whereby coal from the river could be salvaged and power economically produced. At the same time Consolidated erected a new steam plant for itself at Riverside, Maryland.

■ It follows that the contract is invalid because it violates Section 1 of the Sherman Act, 15 U.S.C.A. § 1, which provides that every contract in restraint of trade or commerce among the several states is illegal. While the statute has been held to apply only to those restraints which are unreasonable in character, it has been repeatedly adjudged that price fixing agreements are unlawful *per se*. In U. S. v. Socony-Vacuum Oil Co., 310 U.S. 150, 221, 222, 60 S.Ct. 811, 843, 84 L.Ed. 1129, the court said: "* * * Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces. The Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference. Congress has not left with us the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive. It has not permitted the age-old cry of ruinous competition and competitive evils to be a defense to price-fixing conspiracies. It has no more allowed genuine or fancied competitive abuses as a legal justification for such schemes than it has the good intentions of the members of the combination. If such a shift is to be made, it must be done by the Congress. Certainly Congress has not left us with any such choice. Nor has the Act created or authorized the creation of any special exception in favor of the oil industry. Whatever may be its peculiar problems and characteristics, the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike."

In U. S. v. Masonite Corp., 316 U.S. 265, 276, 62 S.Ct. 1070, 1076, 86 L.Ed. 1461, it was also said: "* * * Since there was price-fixing, the fact that there were business reasons which made the arrangements desirable to the appellees, the fact that the effect of the combination may have been to increase the distribution of hardboard without increase of price to the consumer or even to promote competition between dealers, or the fact that from other points of view the arrangements might be deemed to have desirable consequences would be no more a legal justification for price-fixing than were the 'competitive evils' in the Socony-Vacuum case." See also U. S. v. Paramount Pictures, 334 U.S. 131, 143, 68 S.Ct. 915, 92 L.Ed. 1260; U. S. v. National Ass'n of Real Estate Boards, 339 U.S. 485, 489, 70 S.Ct. 711; Norfolk-Southern Bus Corp. v. Va. Dare Trans. Co., 4 Cir., 159 F.2d 306.

■ So also does an agreement violate the statute which forecloses competitors from a substantial market since the statute is broken as well by the prevention as by the destruction of competition. International Salt Co. v. U. S., 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20; American Federation of Tobacco Growers, Inc. v. Neal, 4 Cir., 183 F.2d 869.

■ Similarly illegal is any agreement for the division of territory between competitors which in this case was effectuated by permitting Consolidated to determine to what customers and in what territory Penn Water might sell. U. S. v. Aluminum Co., 2 Cir., 148 F.2d 416; U. S. v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271, 291, 46 L.R.A. 122.

■ The agreement is also violative of the third section of the Clayton Act, 15 U.S.C.A. § 14, insofar as it requires Penn Water's purchases of power to be approved by consolidated from whom it purchases back feed or supplemental energy in order to meet the requirements of its outstanding contracts. Thereby Penn Water is prohibited from purchasing power from Consolidated's competitiors. See Standard Oil Co. v. U. S., 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371.

The contract is not one which involves the acquisition in legitimate business expansion of the plant of a competitor, such as was upheld in U. S. v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533, where the United States Steel Corporation acquired the assets of a large independent steel fabricator on the west coast. It was there found that the purchase would not unreasonably lessen competition and was not entered into with the intent to monopolize, and that therefore Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2, were not violated. The court held that so-called vertical integration is not illegal *per se,* but must be judged by its effect on competition, and the purpose for which the combination is entered into. The court said, 334 U.S. at page 522, 68 S.Ct. at page 1121: "* * * A restraint may be unreasonable either because a restraint otherwise reasonable is accompanied with a specific intent to accomplish a forbidden restraint or because it falls within the class of restraints that are illegal *per se.* For example, where a complaint charges that the defendants have engaged in price fixing, or have concertedly refused to deal with non-members of an association, or have licensed a patented device on condition that unpatented materials be employed in conjunction with the patented device, then the amount of commerce involved is immaterial because such restraints are illegal *per se.*"

■ In view of these well established rules, it is idle to consider the contentions of Consolidated that the contract was beneficial to the public and to the stockholders of Penn Water since it enabled Penn Water to meet its contractual obligations by supplementing its water power product at Holtwood by Consolidated's steam produced energy, and by guaranteeing to Penn Water stockholders a return on their investment; or that Consolidated was entitled to exercise the restrictive powers in order to protect itself from the risks involved in the obligation which it assumed to pay Penn Water's running expenses; or that the agreement was expressly designed to encourage the maximum cooperative utilization of their power and energy resources to the end that the joint use of their property and equipment should give the greatest practical benefit to the public and avoid duplication of investment and unnecessary costs of maintenance, and thus contribute toward the rendition of a high standard of service. The decisions we have cited conclusively demonstrate that the prohibitions of the statute apply even though the parties to a contract indulge the belief that the agreement may have beneficial results and actually show that in some respects the public is benefited thereby. Congress has determined that the greater good is served by the maintenance of free competition and its decision in the field of interstate commerce must control. See U. S. v. Aluminum Co., 2 Cir., 148 F.2d 416, 426; U. S. v. Reading Co., 226 U.S. 324, 326, 358, 33 S.Ct. 90, 57 L.Ed. 243.

It has been suggested that although regulated industries are not *per se* exempt from anti-trust laws,[3] the statutes do not have the same application to publicly regulated industries as they do to private enterprises and that in the factual situation existing in this case, the statutes were not violated. It is urged that the parties to the basic contract are not competitors in the same field since Consolidated sells its product mainly at retail to customers, while Penn Water sells electric power primarily at wholesale to Consolidated and other retail distributors, and has only one retail customer, the Pennsylvania Railroad Company, which

3. U. S. v. Borden Co., 308 U.S. 188, 60 S. Ct. 182, 84 L.Ed. 181; State of Georgia v. Pa. R. R. Co., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051.

buys in large quantities. It is said that each utility has a legal monopoly in its own field and that there is no proof that the purpose or effect of the agreement has been to raise or fix unreasonably the prices of electric energy in the area served by the parties or that the customers have been deprived of any of the advantages of free competition.

This argument cannot be sustained. It does not give sufficient weight to the decisions, in which the anti-trust acts have been applied to utilities, or to the potential services which Penn Water might render to the public if it were relieved of the contractual restrictions upon its activities. It was held in State of Georgia v. Pa. R. R. Co., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051, in accord with many previous decisions, that railroad carriers are subject to the anti-trust laws although their rates are controlled by the Interstate Commerce Commission; and hence an agreement by carriers to fix rates may be illegal although the rates are reasonable; and that the agreement of a carrier to subject rates to the control of other carriers is invalid since it deprives the carrier of the power to perform the duty imposed upon it to initiate its own rates. That is precisely the vice of the present contract. Penn

Water has surrendered the right to propose its own rates, to extend its own plant, and to enter into new fields of activity; and it is impossible to say that the public interest has not been or will not be jeopardized by its failure to perform the duty to furnish adequate services at reasonable rates involved in its charter privilege to operate.

In short, the grant of monopolistic privileges, subject to regulation by governmental body, does not carry an exemption, unless one be expressly granted, from the anti-trust laws, or deprive the courts of jurisdiction to enforce them. This principle of law has been applied not only to public carriers, see U. S. v. Terminal R. Ass'n, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810; U. S. v. Reading Co., 253 U.S. 26, 40 S.Ct. 425, 64 L.Ed. 760; but in the insurance field, U. S. v. Southeastern Underwriters Ass'n, 322 U.S. 533, 559, 561, 64 S.Ct. 1162, 88 L.Ed. 1140; in the telephone field, U. S. Tel. Co. v. Central Union Telephone Co., 6 Cir., 202 F. 66; and also in the field of gas and electric energy, In re American Fuel & Power Co., 6 Cir., 122 F.2d 223.[4]

On this appeal Consolidated presents for the first time in this case the contention

4. It may be noted in passing that the legal monopoly of a patent does not exempt the patentee from the provisions of the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note. Williston on Contracts, § 1647; Standard Sanitary Mfg. Co. v. U. S., 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107; See, U. S. v. General Electric Co., 272 U.S. 476, 485, 47 S.Ct. 192, 71 L.Ed. 362; Standard Oil Co. v. U. S., 283 U.S. 163, 169, 51 S. Ct. 421, 75 L.Ed. 926.

Since we reach the conclusion that the basic agreement is invalid on its face, we have not found it necessary to consider certain excluded evidence offered by Penn Water which tended to show that the purpose and effect of the agreement was to bring about an unlawful restraint of trade. Much of the evidence is documentary in character and should have been admitted insofar as it related to circumstances which occurred at or prior to the execution of the agreement, and tended to show its illegal purpose, or insofar as it pertained to acts of Consolidated which gave effect to that purpose. The evi-

dence related to the period of Aldred's control. It tended to show that the purpose of the contract was to destroy the power of Penn Water to compete with Consolidated in case Penn Water should fall into unfriendly hands; that Consolidated refused to allow Penn Water to contract with the Potomac Electric Power Company in 1932 for the purchase and sale of power at wholesale; that in 1946, when differences between the parties occurred, Consolidated forbade Penn Water to enter into negotiations with the Philadelphia Electric Company for the extension of contracts between them; and in 1947, after Philadelphia Electric withdrew a notice of termination of its contract with Penn Water, Consolidated objected to the acceptance of this withdrawal; in 1947, when Metropolitan Electric was in need of larger supplies of power, Consolidated objected to Penn Water exercising an option to increase its power to furnish the supplies. Again in 1947 Consolidated directed Penn Water to terminate its contract with Pennsyl-

that the District Court was without jurisdiction to decide whether the basic agreement violates the Sherman Act because exclusive primary jurisdiction to determine that question has been conferred upon the Federal Power Commission by the Federal Power Act,[5] 16 U.S.C.A. §§ 791 to 825r. That question was submitted to the District Court not only by the complaint of Penn Water but also by the answer of Consolidated, and the court took jurisdiction of the issue with the express approval of both parties. Nevertheless Consolidated now contends that exclusive primary jurisdiction to consider the question was lodged in the Federal Power Commission by the statute.

Penn Water is subject to the Federal Power Act as a licensee under Part I of the Act, 16 U.S.C.A. §§ 791a to 823, and as a public utility under Part II of the Act, 16 U.S.C.A. §§ 824 to 824h. Under Section 4(g) of Part I of the statute the Commission has power to investigate and issue orders in the public interest to conserve and utilize power sites of the country. 16 U.S.C.A. § 797(g). It also has power under Section 4(e) to issue licenses upon certain conditions for the construction and maintenance of works for the development, transmission and utilization of power in bodies of water which are subject to the authority of Congress to regulate interstate commerce. 16 U.S.C.A. § 797(e). These conditions are set out in Section 10, 16 U.S.C.A. § 803 and include Section 10(h), 16 U.S.C.A. § 803(h), which is as follows:

"*Monopolistic combinations prohibited*

"(h) Combinations, agreements, arrangements, or understandings, express or implied, to limit the output of electrical energy, to restrain trade, or to fix, maintain, or increase prices for electrical energy or service are hereby prohibited."

Section 20 of the Act, 16 U.S.C.A. § 813, provides that when power enters into interstate commerce, the rates charged and services rendered by a licensee shall be reasonable and non-discriminatory; and whenever any of the states directly concerned has not provided a commission to enforce this requirement within the state, or such states are unable to agree through their properly constituted authorities on the services to be rendered and the rates to be paid, jurisdiction is conferred upon the Commission to regulate and control services and rates.

Section 26, 16 U.S.C.A. § 820, provides that the Attorney General may on request of the Commission or the Secretary of the Army proceed in equity in a District Court of the United States for the purpose of revoking any license for the violation of its terms or to prevent any act of commission or omission in violation of the statute; and the District Courts are expressly given jurisdiction over the proceedings.

Part II of the Act, Sections 201–209, 16 U.S.C.A. §§ 824–824h, authorizes the Commission to regulate the transmission of electric energy in interstate commerce and the sale of such energy at wholesale, provided such regulation shall extend only to those matters which are not subject to the regulation by the states. The duty is imposed upon the Commission to encourage the interconnection and coordination of facilities for the generation and sale of electric energy between regional districts which the Commission is empowered to set up; and the Commission may by order direct a public utility to establish physical connection of its facilities with the facilities of others engaged in the transmission or sale of electric energy. Section 202(b), 16 U.S.C.A. § 824a (b). No public utility may sell, lease or dispose of facilities subject to the jurisdiction of the Commission without applying to it for authority so to do. § 203(a), 16 U.S.C.A. § 824b (a). All rates and charges for such transmission

vania Power & Light on the ground that the rates were too low. In 1947 Penn Water proposed an expansion of its transmission system to meet the needs of its Pennsylvania customers but Consolidated refused. During this period there was a great expansion of the facilities of

other electric utility companies in the Pennsylvania area amounting to a total of $520,400,000 with no expansion by Penn Water or Safe Harbor at the same time.

5. 41 Stat. 1063, 49 Stat. 838.

or sale of electric energy, as well as contracts which affect such rates or services subject to the jurisdiction of the Commission, may be determined by the Commission. § 205(c), 16 U.S.C.A. § 824d (c); § 206(a), 16 U.S.C.A. § 824e (a).

Part III, §§ 301–320, 16 U.S.C.A. §§ 825–825r, relates to administrative and procedural matters. The Commission is given the duty to investigate complaints and power to investigate violations of the Act and hold hearings. §§ 307–308, 16 U.S. C.A. §§ 825f, 825g. It may issue orders and regulations to carry out the statutory provisions; § 309, 16 U.S.C.A. § 825h; and persons aggrieved by any order may obtain judicial review in the Circuit Court of Appeals. § 313, 16 U.S.C.A. § 825*l*. Section 314, 16 U.S.C.A. § 825m, of the Act empowers the Commission to bring an action in the United States District Court to enjoin violations of the statute and to enforce compliance therewith, and further provides that the Commission may transmit evidence of illegal practices to the Attorney General who, in his discretion, may institute criminal proceedings under the Act. The District Courts of the United States are given exclusive jurisdiction of violations of the Act, or of rules or orders thereunder, and of all suits to enforce any duty created by the Act or enjoin any violation thereof. § 317, 16 U.S.C.A. § 825p.

It is contended that these enactments contemplate prior administrative determination by the Commission, and that until this action is taken, the District Courts do not have jurisdiction to revoke licenses under Section 26, 16 U.S.C.A. § 820, or to restrain violations of the statute under Section 314, 16 U.S.C.A. § 825m. It is also suggested that since public utilities like Penn Water were subject to the Sherman Act at the time that the Federal Power Act was passed, there could have been no other reason for the insertion of the prohibitions of the Sherman Act in Section 10(h), 16 U.S.C.A. § 803(h), except to shift the forum in which restraints of trade of public utilities could be ascertained and corrected, from the District Courts to the Commission.

■ The argument does not carry conviction. The prohibition against monopolistic combinations was included among the conditions upon which the Power Commission may issue licenses for the construction and maintenance of power projects—not to deprive the courts of jurisdiction to enforce the anti-trust acts, but to make it perfectly clear that no licensee can legally agree to limit output, restrain trade or fix prices. The condition was a reaffirmance of the Sherman Act and was designed to restrict rather than to enlarge the Commission's authority.

That the condition was not inserted in the Act to shift the forum for the trial of anti-trust questions affecting power companies from the District Courts to the Power Commission is shown by the failure of Congress to empower the Commission in Section 10(h), 16 U.S.C.A. § 803(h), to entertain proceedings before it to enforce the condition against monopolistic combinations. This omission is in marked contrast with the authority expressly conferred upon the Commission in respect to all the other conditions of the license to take steps to make them effectual. For example, in Condition (a) which provides that the project shall be such as is best adapted in the judgment of the Commission to utilize and improve the waterway involved, the Commission is given authority to require modification of the plans and specifications.

■ It is true that Section 26, 16 U.S.C. A. § 820, of the Federal Power Act empowers the Commission to take action when the terms of the license are violated, but the manner in which the Commission is directed to proceed makes it very clear in the light of decisions in analogous cases that Congress did not intend to oust the District Courts of jurisdiction over violations of the Sherman Act. The Commission's function is merely to request the Attorney General to institute suit to control the offending licensee and thereafter, if the Attorney General sees fit to act, the District Court has jurisdiction to determine whether the terms of the license have been violated and to apply the proper remedy. This procedure, however, falls far

short of making the jurisdiction of the District Court contingent upon prior administrative action of the Commission, and there is nothing in the section which contemplates that the Commission must first determine administratively whether the grounds of revocation exist before the Attorney General may institute proceedings against the offender. The Commission may request court action in a proper case and the Attorney General may comply or refuse in his discretion, but there is nothing to show that the Attorney General may not act upon his own motion precisely as he did before the statute was passed.[6]

The case is closely analogous to the decision in U. S. Alkali Ass'n v. U. S., 325 U.S. 196, 65 S.Ct. 1120, 89 L.Ed. 1554, which related to the provisions of the Webb-Pomerene Act, 15 U.S.C.A. § 61 et seq., that exempted associations engaged in export trade from the prohibitions of the Sherman Act, provided the Association acted in accordance with certain conditions. The Federal Trade Commission was empowered to investigate if it had reason to believe that the activities of an export association were not in accordance with the provisos and, if violations of the Sherman Act were found, to make recommendations to the Association for readjustment of its business in accordance with law; and if the Association should fail to comply with the recommendations, to send the findings and recommendations of the Commission to the Attorney General for such action as he should deem proper. It was held that the exercise of these powers by the Commission was not a prerequisite to a suit by the United States against an export association to restrain violations of the Sherman Act. The court showed that the grant of power to the Commission did not repeal *pro tanto* the authority conferred upon the Attorney General by the Sherman Act to enforce its provisions, and that although the Commission might render useful service by bringing violations to the attention of the Attorney General, the enforcement of the statute is in his hands and the Commission's authority is exhausted when it refers its findings to him. The court took notice of the fact that the provisions of the Sherman Act with reference to enforcement through the Attorney General were not expressly repealed by the Webb-Pomerene Act as to export associations and emphasized the principle that repeals by implication are not favored.

In U.S. v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181, a similar decision was made. An indictment against certain producers and distributors of milk for violation of the Sherman Act was sustained notwithstanding the provisions of the Capper-Volstead Act, 7 U.S.C.A. §§ 291, 292, whereby dairymen were authorized to act in concert in marketing their goods, and the Secretary of Agriculture was authorized to determine, subject to judicial review, whether a cooperative corporation restrained trade to such an extent that price of the product was unduly enhanced, and if so, to issue a cease and desist order. This procedure was held not to replace or prevent a criminal prosecution under the Sherman Act without prior action by the Secretary of Agriculture. See also Hinton v. Columbia River Packers Ass'n, 9 Cir., 131 F.2d 88, where a similar construction was given to the statutes respecting Fishermen's Cooperatives, which empowered the Secretary of the Interior to issue cease and desist orders to any association which should seek to monopolize trade in any aquatic project. In these cases the principle laid down in Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638, that one who seeks relief in equity must first exhaust his administrative remedy was held inapplicable.

The argument of the appellee completely ignores these decisions and rests principally upon U. S. Navigation Co. v. Cunard S. S. Co., 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408,

6. The power conferred upon the commission by Section 825m to bring suit on its own initiative in the District Court to enjoin violations of the Federal Power Act or enforce compliance therewith obviously does not deprive the District Court of jurisdiction to enjoin complaints instituted by the Attorney General or other parties.

and similar cases. That suit was brought by a shipping company in the United States District Court to enjoy a combination of shipping companies alleged to be engaged in monopolistic practices in violation of the anti-trust acts, and it was held that the court was without jurisdiction since Congress had afforded an exclusive remedy in a proceeding before the United States Shipping Board under the Shipping Act of 1916, 46 U.S.C.A. § 801 et seq., and the Merchant Marine Act of 1920, 46 U.S.C.A. § 861 et seq. Section 14a of the statute authorized the Shipping Board, upon its own initiative, or upon a complaint to determine whether any person had violated the prohibitions of the Act against rebates or unfair discrimination or the suppression of competition, and Section 22 empowered the Board to direct payment of reparation for injuries caused by violations of the Act. Jurisdiction to enforce the orders of the Board was conferred upon the District Courts by Sections 29 and 30. The court followed the line of decisions with respect to the preliminary jurisdiction of the Interstate Commerce Commission over carriers by rail and held that the case was remedial under the Shipping Act, and that the matter was within the exclusive primary jurisdiction of the Shipping Board and to that extent the anti-trust laws were superseded. Decisions in the kindred field of railroad transportation reach the similar result that complaints in respect to the rates and charges by carriers subject to the jurisdiction of the Interstate Commerce Commission must be submitted to the Commission for preliminary administrative action in order to give jurisdiction to the federal court. Texas & Pac. R. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S. Ct. 350, 51 L.Ed. 553; Keogh v. C. &. N. W. Ry. Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed.

183; Terminal Warehouse Co. v. Penn. R. Co., 297 U.S. 500, 56 S.Ct. 546, 80 L.Ed. 827.

A comparison of the provisions of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., and the Shipping Act, on the one hand, with the provisions of the Federal Power Act, on the other, demonstrates that the present case is ruled by the line of decisions of which U. S. Alkali Ass'n v. U. S., supra, is a notable example, rather than by the cases last cited. The maintenance of uniformity of regulation and the control of the activities of an industry of national scope by a specialized body are as important in the field of electric power as in the field of transportation by rail or water; but the control of the Federal Power Commission over the power sites of the country and over the interstate transmission of electric energy is not disturbed by the retention of the jurisdiction of the courts to enforce the anti-trust acts. Indeed the Federal Power Commission itself has indicated that in its opinion it possesses the power to regulate the rates for the transmission of electric energy by Penn Water in Pennsylvania to Consolidated in Maryland, and to maintain the interconnection of their facilities, even if the basic contract between them is invalid.[7]

We are referred to four proceedings conducted by the Federal Power Commission in respect to the activities of Penn Water in which its relations to Consolidated and Safe Harbor were involved and the coordination of their facilities in the transmission of electric energy were approved. The first proceeding originated on September 2, 1938, in a show cause order of the Commission to compel Penn Water to take a license under Part I of the Act, and finally resulted in an issuance of the license after an unsuc-

7. Even if it should be held that the Federal Power Act requires a preliminary determination by the Federal Power Commission in order to clothe a District Court with jurisdiction to entertain a suit to revoke a license or enjoin an act of a utility in violation of the anti-trust acts, it would not necessarily follow that such a determination is necessary to give jurisdiction to the District Court in a case of this kind. The instant suit was not brought to enforce the anti-trust acts, but to secure a judgment declaring that the basic agreement violates these acts and is therefore void. See the Declaratory Judgment Act, 28 U.S.C.A. § 2201. However, in view of the conclusions stated in our opinion, it is not necessary for us to determine the weight to be given to this distinction.

cessful appeal in Pennsylvania Water & Power Co. v. F. P. C., 74 App.D.C. 351, 123 F.2d 155; see 2 F.P.C. 61, 4 F.P.C. 426. The basic agreement of 1931 had been on file with the Commission since January 13, 1936, as a rate schedule of Penn Water under Section 824d(c) of the Federal Power Act, but there was no mention of the agreement in the proceeding although the Commission in issuing the license stated that the project was best adapted to a comprehensive plan for developing the Susquehanna River for the use and benefit of interstate or foreign commerce.

The second and third proceedings involved investigations into the wholesale rates charged by Safe Harbor under a tripartite contract among Safe Harbor, Penn Water and Consolidated, which complemented the basic agreement of 1931. In the second proceeding the Commission issued an order reducing the Safe Harbor's rates, 2 F.P.C. 182; but the order was set aside on appeal in Safe Harbor Water Power Corp. v. F.P.C., 3 Cir., 124 F.2d 800, on the ground that the jurisdiction of the Commission was dependent upon the inability of the Maryland and Pennsylvania Utility Commissions to agree, which had not been shown. This defect was cured in the third proceeding, 5 F.P.C. 221, and on appeal the rate order of the Commission was upheld. Safe Harbor Water Power Corp. v. F.P.C., 3 Cir., 179 F.2d 179. The activities of the interconnected systems were commended by the Commission as producing electric energy at the lowest cost as well as insuring reliability of service. The Commission described the provisions of the basic agreement in regard to the right of the Maryland Company to all the electric capacity of Penn Water not otherwise disposed of, the right of Penn Water to a supply of steam generated energy from Consolidated and the agreement of Consolidated to reimburse the Pennsylvania Company for its operating expenses, as well as a return on its investment. The restrictive provisions of the agreement were not mentioned and their legal validity was not discussed.

The fourth proceeding was instituted by the Commission to investigate the reason-ableness and legality of the charges of Penn Water for wholesale energy sold to Consolidated under the basic agreement. Consolidated and both state commissions intervened. On January 4, 1949, the Commission filed its opinion and order reducing the rates, In the Matter of Pennsylvania Water & Power Co., F.P.C. Docket No. IT-5915, opinion No. 173. An appeal from this order is now pending in the Court of Appeals of the District of Columbia. Penn Water filed a petition for rehearing alleging amongst other reasons that the basic agreement was null and void in that it violated the Sherman Act and Section 803(h) of the Federal Power Act, but this application was denied in an opinion filed on February 28, 1949, In the Matter of Pennsylvania Water & Power Co., Docket No. IT-5915, opinion No. 173A. In this opinion the Commission referred to the economies resulting from the combined power requirements of the three companies and referred to the basic contracts in the following terms:

"By the terms of those contracts the installation of additional facilities by Penn Water is subject to approval by Baltimore Company, to assure coordinated planning and investment to meet the growing power needs of the system as a whole with resulting additional economies and consumer benefits.

"The regional integration and coordination of facilities, the resulting economies, and the utilization and conservation of natural resources thus achieved are precisely what was sought to be encouraged and fostered by the Federal Power Act and established as a part of the criterion of the public interest to be served by regulation thereunder (cf. Section 202(a)). *If there are questions as to the legality of the foundation contracts which are in litigation, as Respondents' application for rehearing indicates, the validity of our order is not dependent upon the decision of those questions.* In our opinion and order we took care to leave the continuation of the operation of the integrated and interconnected system in full effect, merely changing the rates, as shown by our statement wherein we specifically stipulated that 'The present

arrangement whereby sales to Pennsylvania customers are made on a firm basis on definite rate schedules whereas Baltimore Company takes what is left and assures Respondents of the recovery of all proper operating expenses, depreciation, taxes and a fair return, is the most practicable under the circumstances. That arrangement will, therefore, be continued with, however, such modifications as are necessary to accomplish the reductions mentioned above to Pennsylvania Power & Light, Philadelphia Company, Metropolitan Company and Baltimore Company.' (Italics supplied.)

"Now, by the changes referred to in Penn Water's application for rehearing, all of the carefully built-up benefits of pool design, investment, construction and operation apparently are intended to be sacrificed by Penn Water. Penn Water's non-receipt of steam generated energy from outside Pennsylvania for sale to resale customers would destroy the pool economies under the established method of operation."

This view of expert government authority is entitled to respect and we do not venture to say that the physical connection of the facilities of the two utilities, and the interchange of electric power produced by water in Pennsylvania and by steam in Maryland is not a desirable utilization of their combined resources. Nor do we undertake to gainsay the view of the Commission that even if the restrictive conditions of the basic contract are invalid, as to which the Commission expressed no opinion, it still has the duty and authority under the Federal Power Act to encourage and establish the interconnection of electrical facilities of regional districts if it finds that such action is necessary and appropriate in the public interest, and will not interfere with the lawful authority of the state commissions in respect to the generation and distribution of electrical energy in intrastate commerce. §§ 201, 202(a) (b), 16 U.S.C.A. §§ 824, 824a(a) (b).

We are brought by these considerations to the contention of the Pennsylvania Public Utility Commission, an intervener in this case, that the basic agreement is invalid not only because it violates the anti-trust acts but also because it disables Penn Water from performing its proper function as a public utility under the public utility laws of Pennsylvania. The regulation is based upon the provisions of Section 3, Article 3, of the Public Service Company Law of Pennsylvania, approved July 26, 1913, Pamphlet Laws 1374,[8] which was in effect when the basic agreement was executed in 1931 and also upon Sections 202(d) and 202(e) of Public Utilities Law, approved May 28, 1937, 66 Purdon's Pennsylvania Statutes Ann. § 1101 et seq. which are set out in the margin.[9]

There can be no doubt that the freedom of action of Penn Water as a public utility of the state has been and is restricted by the provisions of Articles IV and V of the basic agreement whereby Penn Water is required to get the approval of Consolidated before making any agreement for the purchase or sale of electric

---

8. Section 3. "Upon like approval of the commission first had and obtained, as aforesaid, and upon compliance with existing laws, and not otherwise, it shall be lawful— * * *
"(c) For any public service company to sell, assign, transfer, lease, consolidate, or merge its property, powers, franchises, or privileges, or any of them, to or with any other corporation or person."

9. Section 202. *"Enumeration of acts requiring certificates.* Upon approval of the commission, evidenced by its certificate of public convenience first had and obtained, and upon compliance with existing laws, and not otherwise, it shall be lawful * * *

"(d) For any public utility to dissolve, or to abandon or surrender, in whole or in part, any service, right, power, franchise, or privilege * * *
"(e) For any public utility, except a common carrier by railroad subject to the Interstate Commerce Act, to acquire from, or to transfer to, any person or corporation, including a municipal corporation, by any method or device whatsoever, including a consolidation, merger, sale or lease, the title to, or the possession or use of, any tangible or intangible property used or useful in the public service * * *."

power or making any investment or disposition of any property in excess of $50,000. In other words, Penn Water's power to propose prices and improvements and extend its services has been surrendered to Consolidated, and there can be no doubt that this surrender amounts to a transfer *pro tanto* of its powers and franchises to the Maryland utility without approval of the Pennsylvania Commission in violation of the Pennsylvania statute.

Indeed such restrictions upon the freedom of a public utility cannot be sustained irrespective of statutory prohibition. It was so held in Gibbs v. Baltimore Gas Co., 130 U.S. 396, 9 S.Ct. 553, 32 L.Ed. 979, in considering a contract between two competing Baltimore gas companies which was made in 1884 prior not only to the Pennsylvania Public Utility Acts but also the Sherman Act of 1890. The companies agreed to sell their product at a fixed price which could not be changed except by mutual consent except that the larger company in case of competition on the part of another company might reduce its price. They also agreed that one of the companies should lay no more pipes for the supply of gas. In denying recovery upon the contract because of invalidity, the Supreme Court said in 130 U.S. at pages 410–411, 9 S.Ct. at page 558:

"It is also too well settled to admit of doubt that a corporation cannot disable itself by contract from performing the public duties which it has undertaken, and by agreement compel itself to make public accommodation or convenience subservient to its private interests.

" 'Where,' says Mr. Justice Miller, delivering the opinion of the court in Thomas v. Railroad Co., 101 U.S. 71, 83 [25 L.Ed. 950], 'a corporation, like a railroad company, has granted to it by charter a franchise intended in large measure to be exercised for the public good, the due performance of those functions being the consideration of the public grant, any contract which disables the corporation from performing those functions, which undertakes without the consent of the state to transfer to others the rights and powers conferred by the charter, and to relieve the grantees of the burden which it imposes, is a violation of the contract with the state, and is void as against public policy.' "

See also Central Transportation Co. v. Pullman's Palace-Car Co., 139 U.S. 24, 48, 51, 11 S.Ct. 478, 35 L.Ed. 55; U. S. Tel. Co. v. Central Union Tel. Co., 6 Cir., 202 F. 66, *72, 73.*

 One of the most important duties of a public utility, inherent in its franchise to serve the public, is the duty to take the initiative in proposing reasonable rates and rendering adequate services, taking into account changing conditions; and the utility is not relieved from this duty because its activities are subject to governmental regulation, for a regulatory commission is not clothed with the responsibility or qualified to manage the utility's business.[10] The decisions in respect to this matter, both before and after the establishment of regulatory commissions, are in accord with the principles laid down in Gibbs v. Baltimore Gas Co., supra. See Arizona Grocery Co. v. A. T. & S. Fe Ry. Co., 284 U.S. 370, 384, 52 S.Ct. 183, 76 L.Ed. 348; State of Georgia v. Pa. R. Co., 324 U.S. 439, 458–460, 65 S.Ct. 716, 89 L.Ed. 1051; U. S. Tel. Co. v. Cent. Union Tel. Co., 6 Cir., 202 F. 66, 71–72; see also Magaha v. City of Hagerstown, 95 Md. 62, 51 A. 832, 93 Am.St.Rep. 317. The conclusion is inescapable that the contractual restrictions upon the power of Penn Water to perform its functions as a utility under the Pennsylvania statute are invalid.

This conclusion is not avoided by the fact that Penn Water is a public utility under Part II of the Federal Power Act, and subject as such to the regulation of the

---

10. "It must never be forgotten that while a State may regulate, with a view to enforce reasonable rates and charges, it is not the owner of the property of public utility companies and is not clothed with the general power of management incident to ownership." Southwestern Bell Tel. Co. v. Pub. Serv. Comm., 262 U.S. 276, 289, 43 S.Ct. 544, 67 L.Ed. 981. See also Northern Pa. Power Co. v. Pa. P. U. C., 132 Pa.Super. 178, 200 A. 866, Id., 333 Pa. 265, 5 A.2d 133.

Federal Power Commission. There is, however, a limitation upon the jurisdiction of the Federal Power Commission over public utilities subject to Part II of the Federal Act, §§ 201 to 209, which is set forth as follows in Section 201(b), 16 U.S. C.A. § 824(b), as follows: "(b) The provisions of sections 824–824h of this title shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in sections 824–825r of this title, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter." This language has been held to mean what it says, Connecticut Light & Power Co. v. Federal Power Commission, 324 U.S. 515, 527, 65 S.Ct. 749, 89 L.Ed. 1150; cf. Jersey Cent. Power & Light Co. v. F. P. C., 319 U.S. 61, 63 S.Ct. 953, 87 L.Ed. 1258; and hence there is a field in which the Pennsylvania Utility Commission is qualified to act. The evidence in this case shows that Penn Water is engaged in the production and local distribution of electrical energy to local utilities which distribute power to consumers in Pennsylvania, and in respect to this business, it seems clear that the state commission possesses regulatory power. The restrictive provisions of the basic agreement apply to all of the activities of Penn Water, including not only the transmission and sale of electric energy interstate but the local distribution within the State of Pennsylvania, and the surrender to Consolidated of Penn Water's duties obviously affects its local as well as its interstate activities. Viewed in this light it is clear that the contention of the Pennsylvania Commission as to the invalidity of the basic agreement is well founded.

It is not our function in this case to decide how far the activities of Penn Water and Consolidated under the basic contract are subject to the regulations of the Federal Power Commission or the Pennsylvania Public Utility Commission, either or both. It has been held that the purchase by one Pennsylvania utility of the securities of another must be approved by both commissions. See Northern Pa. Power Co. v. Pa. P. U. C., 132 Pa.Super. 178, 200 A. 866, Id., 333 Pa. 265, 5 A.2d 133. It may well be, although the present arrangement between the Maryland and Pennsylvania utilities is invalid for the reasons set forth, that an interconnection of facilities and an interchange of electrical energy between them may be continued by some method that would meet with the approval of the appropriate regulatory authority and will not offend either the anti-trust laws or the utility laws of Pennsylvania. That question is not before us. We hold merely that the benefits that have heretofore flowed from the basic contract do not protect it from the impact of the Sherman Act; and that the contract is invalid since it violates that statute and disables Penn Water from performing its proper function as a public utility under the public utility laws of Pennsylvania; and that the District Court had jurisdiction in the premises.

In view of these conclusions we have not found it necessary to consider the contentions of Penn Water that the basic agreement was beyond the powers of Penn Water under the Pennsylvania law, or that Penn Water has properly terminated the agreement because of breaches thereof by Consolidated.

The case will be remanded to the District Court with instructions to enter a declaratory judgment in accordance with this opinion.

Reversed and remanded.