**PENNSYLVANIA WATER & POWER CO. et al. v. CONSOLIDATED GAS ELECTRIC LIGHT & POWER CO. et al.**

**Civ. No. 5253.**

United States District Court, D. Maryland.

May 3, 1951.

Wilkie Bushby, New York City, James Piper, R. Dorsey Watkins, Baltimore, Md., Piper, Watkins, Avirett & Egerton, Baltimore, Md. for Pennsylvania Water Co.

Wm. J. Grove, Lloyd S. Benjamin, and Chas. E. Thomas all of Harrisburg, Pa., for Pennsylvania Public Utilities Commission.

Alfred P. Ramsey, Harry N. Baetjer, Baltimore, Md., Venable, Baetjer & How-

ard, Baltimore, Md., for Consolidated Gas Co.

Paul F. Due, Baltimore, Md., for Safe Harbor Corp.

Chas. D. Harris, Baltimore, Md., for Maryland Public Service Commission.

BRYAN, District Judge.

Pattern for decision here is prescribed by Pennsylvania Water & Power Co. v. Consolidated Gas Electric Light & power Co., 4 Cir., 184 F.2d 552, from which it follows that summary judgment must go for the plaintiffs on their motion. The instant or 3-party contract of June 1, 1931, designs a restraint violative of the Sherman Act, 15 U.S.C.A. § 1 et seq., and in the process breaks the Pennsylvania laws by reducing Safe Harbor Water Power Corporation from a public utility to an impotent agency of the other parties. This conclusion is reached from an examination of the agreement in the light of the following indisputable and environing facts: that generation of electricity for wholesale is the business of each of the parties; that the geographical and relative location of their generating plants, of Penn's and Consolidated's transmission lines and interconnections, and of the territory and patrons served by all of them, are as shown upon the map now in the record; and that the 2-party agreement, Safe Harbor's corporate papers, its certificate of convenience, the orders of the Pennsylvania Utility Commission thereon, and the pertinent statutes of that State, are as pleaded.

I. Two of the contracting parties, Penn and Consolidated, are conclusively found to be potential competitors in the Penn Water Case, supra. That the third party, Safe Harbor, is also a latent competitor is manifest from the location of its plant in reference to Penn Water's, from the easy deliverability of its power to the customers of Consolidated, notably in the Washington area, as well as to the patrons of Penn Water, albeit at present needing the transmission lines of the latter for such purposes. The opinion in the Penn Water Case recounts the routing of all their generated power, including Safe Harbor's, and thereby clearly proves its competition with the current of the others.

It might almost be said that the judgment in the Penn Water Case struck down the 3-party agreement as well as the 2-party contract, so closely are the agreements tied together by their terms. The nexus is declared amain by the recitals in the second and third paragraphs of the 2-party agreement, virtually avowing the 2-party to be the master agreement operating the 3-party contract. Article II expressly incorporates Safe Harbor power as an item of the 2-party agreement. The supplement, dated August 1, 1932, to the 3-party contract reaffirms the terms of the latter but in its section Fourth adopts some of the terms of the 2-party agreement. As will be evident upon their discussion, the play of the restrictive covenants in the 3-party agreement reveals this contract as a furtherance of the 2-party plan, extending the 2-party circumscription to the source of the Safe Harbor energy. Nevertheless the Court will construe the 3-party agreement de novo.

Examining the agreement, we find its affront to the Act consists of the investiture of Penn and Consolidated with the absolute power to restrict the other, in the use and enjoyment by such other, of its rightful entitlement in Safe Harbor's production, as well as to restrict Safe Harbor in its freedom of contract and action generally. The principal restrictions are contained in Articles III and IV.

Under Article III(a) "additional machinery or equipment" shall be installed by Safe Harbor at the request of Consolidated or Penn at the expense and for the use of the requesting party, but only with the consent of the other. By the same Article no current from "additions" to the Safe Harbor Plant may be supplied to anyone other than Penn and Consolidated without the consent of both of them. As an over-all restraint, Article IV forbids Safe Harbor to "enter into other agreements with either receiving company without the approval of the other."

These stipulations are strangulations. They choke each of the recipients in its full exercise of its ownership in the power

purchased of Safe Harbor; they choke Safe Harbor too. They do not merely limit one party from impinging the other's rights; their reach is more than defensive.

No mechanical appliances, if and when available, could be furnished by Safe Harbor for Penn Water, though at Penn Watter's expense, say to multiply, preserve or improve Penn Water's share, without Consolidated's approval, or vice versa. By forbidding the sale of power from such additions to anyone else, plant additions by Safe Harbor are effectually banned unless approved by *both* of the other two—even an addition for the benefit, and at the cost, of only one of them.

As Safe Harbor may not contract *in any manner* as to the generation and supply of energy, with Penn or Consolidated without the assent of the other, neither Penn nor Consolidated could establish any other outlets, than those originally fixed at the plant to draw off its purchase of power, without the nod of the other. Consolidated having no direct connection with Safe Harbor could never obtain one if Penn objected. Article XII fixes the points of delivery from the Safe Harbor plant and makes any change dependent on the approval of both Penn and Consolidated. The supplemental agreement of August 1, 1932, exemplifies the enforcement of Article XII.

Penn or Consolidated could not by its sole direction release any part of its contract share to allow any portion to be sold and diverted elsewhere by Safe Harbor, notwithstanding Article III (c) contemplates such sales.

Similarly Safe Harbor is barred from selling any power to others, assuming such power to become available through expansion of its plant, because under the contract it cannot sell, save to Penn and Consolidated, energy derived from additions.

Threat of injury to the public from a contract of this kind is obvious, without reference to legislation, such as the Shermen Act, outlawing restraints.

Of similar stipulations in the Penn Water Case the Court of Appeals declared their effect "forbids plant expansion or development", prevents the sale of electric energy by one corporation without the approval of the other, and thereby empowers the one to fix the prices of the other. 184 F.2d 557, 558. No other authority is requisite to justify the conclusion that the instant stipulations per se violate the Sherman Act and are not saved by the "rule of reason".

It is no answer to argue that in fact additions are not possible at Safe Harbor and the contract restriction thereof is consequently only of academic interest. When the contract was executed, and that is the time as of which its validity must be judged, expansion was admittedly practicable. Indeed, the supplemental agreement of November 22, 1939, authorized such an extension and at the same time evinced the parties' familiarity with the assailed restriction. It is dangerous to prophesy what science may do towards expansion. However, no factual issue is here presented—on the feasibility of additions—because the restriction is by its breadth and sweep condemning in and of itself. Then, too, the restraint includes "additional machinery or equipment" as well as "additions to its plant" and the possibility of its installation is surely not moot.

The enumerated consequences of Articles III (a) and IV are not hypercritical suppositions of remote possibilities; they are the immediate potentialities of those stipulations.

No less objectionable are the restrictions when the arrangement devised by the contract is viewed as solely a plan for the joint ownership and operation of the Safe Harbor plant by Penn Water and Consolidated, that is, if Safe Harbor Corporation be treated as merely an instrument for holding and operating the plant for the other two. If this were legally possible, or if the joint ownership and operation had been accomplished without the intervention of another corporation, the restrictions of the contract would be just as obnoxious. They would still enable each corporation unwarrantably to control the use and enjoyment by the other of its share of the joint product.

That the plan was simply one of joint ownership and operation is refuted by the actualities. The parties saw fit to adopt the present means. They have brought into the scheme a live, separate, and independent public service corporation, the Safe Harbor Water Power Corporation. The latter is a real party to the contract, with definite obligations and liabilities. Consolidated and Penn Water may not now ignore its reality. Schenley Distillers Corp. v. U. S., 326 U.S. 432, 437, 66 S.Ct. 247, 90 L.Ed. 181. It is not a wholly owned subsidiary of either. Its individuality at once appears when we recall that its capital stock may at any time become the property of others than Penn Water and Consolidated, or that the stockholders might disagree, as apparently they have now. Safe Harbor's independence is starkly accentuated in the realization that it owes important duties to the public, for which it must account through the appropriate governing bodies of the State of Pennsylvania. But, even so, the status of Safe Harbor is not decisive of this case; it may be classed as a nonentity, a subsidiary of the other parties, or their creature, n'importe, and yet the agreement would still be vitiated by the mutually constricting covenants between Penn and Con.

II. Again, the agreement in suit as plainly transgresses the laws of the State of Pennsylvania as did the 2-party contract in the Penn Water Case, supra. Just as the agreement there disabled Penn Water from the performance of its public duties, so here the present contract, through the restraints effected by Articles III and IV in the manner already pointed out, has caused Safe Harbor to contravene the Pennsylvania statutes proscribing the surrender to another, without the approval of its Public Utility Commission, of any of its powers, franchises or privileges. Judge Soper's discussion of this subject fully and featly disposes of it. 184 F.2d at pages 566–568.

The aim of the 3-party agreement is to place the internal control of Safe Harbor in the hands of Penn Water and Consolidated. It does so not only by the restrictions of Articles III and IV but also through the Operating Committee established by Article XIV. This Article constitutes the Committee as both advisory and regulatory of Safe Harbor. The board of directors of Safe Harbor are deposed from their place of guidance and responsibility. In few, the contract destroys the corporate virility of Safe Harbor and subjugates it as a mandate of Penn Water and Consolidated, depriving Safe Harbor of the discretion and initiative necessary to respond and be alive to its public obligations. This is intolerable under the common law and statutes of the State of Pennsylvania.

In the briefs and oral argument the defendants, while insisting that the restrictions of the contract were not invalid, urged that they were severable from the contract, and if unlawful, they could be stricken without violence to the remainder of the agreement. Whether or not contract provisions are separable must be determined from the face of the agreement where the agreement is clear and complete. Study of the 3-party contract convinces the Court that the objectionable provisions cannot be severed from the whole; that the agreement is entire and indivisible, its covenants dependent; and that the restrictive terms are of the warp and weft of the agreement and, if taken out, the residual could not be said to represent the agreement of the parties. U. S. v. Bethlehem Steel Corp., 315 U.S. 289, 298, 62 S.Ct. 581, 86 L.Ed. 855.

The Court has no doubt of its jurisdiction of this case, and its right to consider the non-federal ground of the cause of action; that there is no genuine issue of fact in the foundation upon which the motion for summary judgment is made; and that it is an appropriate instance for the entry of a summary declaratory judgment.

 Finally, the Court observes that in determining whether the contract violates the Sherman Act or the common and statute law of Pennsylvania, it must be read objectively and impersonally, and must be measured against the public interest evidenced by the Sherman Act, the public utility laws of Pennsylvania, and the policy of the common law; if in posse it is offen-

sive to either, the contract must fall, irrespective of the pure intention or good faith of the parties.

After submission to opposing counsel for comment as to form, counsel for the plaintiffs will present a decree declaring invalid and inoperative the 3-party agreement of June 1, 1931 with its two supplements.