CONSOLIDATED GAS ELECTRIC LIGHT & POWER CO. OF BALTIMORE et al. v. PENNSYLVANIA WATER & POWER CO. et al.

No. 6315.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 9, 1951.

Decided Jan. 3, 1952.

---

John Henry Lewin and Harry N. Baetjer, Baltimore, Md. (Alfred P. Ramsey, G. Kenneth Reiblich, and Norwood B. Orrick, all of Baltimore, Md., and Sullivan & Cromwell, New York City, on the brief), for appellant Consolidated Gas Electric Light and Power Co.

Charles D. Harris, Baltimore, Md., for appellant Public Service Commission of Maryland.

Howard E. Wahrenbrock, Asst. General Counsel, Washington, D. C. (Bradford Ross, General Counsel, Reuben Goldberg and Theodore French, Attorneys, Federal Power Commission, all of Washington, D. C., on the brief), for Federal Power Commission, Intervener.

Wilkie Bushby, New York City (James Piper and R. Dorsey Watkins, Baltimore, Md., on the brief), for appellee Pennsylvania Water & Power Company.

William J. Grove, Asst. Counsel, Harrisburg, Pa. (Lloyd Benjamin, Acting Counsel, Pennsylvania Public Utility Commission, Harrisburg, Pa., on the brief), for appellee Pennsylvania Public Utility Commission.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This appeal is taken from a declaratory judgment holding invalid an electric power contract between three public utility companies, that is, Safe Harbor Water Power Corporation, a Pennsylvania corporation, Consolidated Gas Electric Light & Power Company of Baltimore, a Maryland corporation, and Pennsylvania Water and Power Company, a Pennsylvania corporation. Three agreements dated June 1, 1931, August 1, 1932 and November 22, 1939 respectively, are involved of which the first is basic. A summary judgment for the plaintiff D.C., 97 F.Supp. 952, was entered upon the complaint, answer and accompanying affidavits.

To be understood the controversy must be considered in connection with the opinion of this court in Pennsylvania Water & Power Co. et al. v. Consolidated Gas &c.

Co., et al., 4 Cir., 184 F.2d 552 certiorari denied 340 U.S. 906, 71 S.Ct. 282, 95 L.Ed. 655 and with the supplemental opinion of this court, 4 Cir., 186 F.2d 934. Therein a basic electric power agreement of June 1, 1931, (the same date as the basic agreement in the pending suit), and two other agreements dated December 31, 1927 and September 29, 1939 respectively between two of the same parties, that is, Consolidated and Penn Water, were adjudicated invalid by a declaratory judgment. In both the pending and prior case the Pennsylvania Public Utility Commission and the Public Service Commission of Maryland have been allowed to intervene, the former in support and the latter in opposition to an adjudication of invalidity.

The Federal Power Commission has filed a petition to intervene in this appeal; but we are not engaged in the review of the enforcement of an order of an administrative board or commission, for which intervention is provided by Rule 27 (3) of this court. Moreover, the contracts in issue in this case and in the prior case have been on file with the Commission for a long time and orders by it have been based thereon; attorneys for the Commission were present during the trial of the pending case (and of the prior case) in the District Court, and the Commission has been fully apprised of these proceedings in other ways, and yet it took no steps to intervene until a short time before the argument of this appeal. There was no attempt in the District Court to comply with Rule 24 of the Federal Rules of Civil Procedure, 28 U.S.C.A., which require that an application for intervention shall be timely and shall be accompanied by a pleading setting forth the intervenor's claim or defense. The Commission's petition to intervene is therefore denied; but it has been given an opportunity by brief and oral argument to present its views in support of the validity of the contract in suit.

The decision of Judge Albert V. Bryan in the District Court herein was based on the opinion of this court in the earlier case. We there held that the contract between Consolidated and Penn Water, then in suit, which for convenience may be called the Penn Water Contract, was invalid, because Articles IV and V of the basic agreement of June 1, 1931 conferred upon Consolidated the power to control: (1) the prices at which Penn Water might sell its product; (2) the extent to which Penn Water might extend its plant; (3) the territory in which Penn Water might sell its product; and (4) the amount of back feed energy which Penn Water must purchase from Consolidated. These restrictions, we concluded, invalidated the contract because they constituted restraints of interstate commerce in violation of Section I of the Sherman Act, 15 U.S.C.A. § 1, and also because they disabled Penn Water from the free exercise of its proper function as a public utility of the State of Pennsylvania, subject to the control of the Pennsylvania Public Utility Commission under the public service laws of the state. The contract between the three utility companies now before us, which for convenience may be called the Safe Harbor contract, also contains unlawful restrictions and conditions; and this appears so clearly from the provisions of the basic document and from its close connection with the contemporary invalid Penn Water contract as to leave little room for discussion.

The activities of Consolidated and Penn Water in the production and distribution of electric energy are described in our earlier opinion. Safe Harbor is an electric utility company which was formed on January 6, 1930 by the merger of two predecessor companies. It has the right to generate and sell hydro electric energy under a certificate of public convenience issued by the Pennsylvania Commission. It also operates under a license issued by the Federal Power Commission on April 22, 1930. Its property is located on the Susquehanna River at Safe Harbor in Lancaster County, Pennsylvania, and consists of a dam and a large hydro electric generating plant with an effective installed capacity of 230,000 k. w. which was constructed in large part between 1930 and 1934, with additions in 1940. It is connected with the transmission system of Penn Water and through it with the lines of Consolidated. These two

utilities are its only customers under an arrangement approved by the Pennsylvania Commission. The Safe Harbor enterprise was in fact developed and financed by Consolidated and Penn Water, and each acquired and now hold one-half of its voting stock. In addition Consolidated holds an equal amount of non-voting stock, so that it owns two-thirds of the outstanding stock.

On June 1, 1931 the transactions between the three utilities culminated in the two basic agreements above referred to. They are long term agreements designed to continue in force until April 22, 1980. Previously, on December 31, 1927, Consolidated and Penn Water, as is shown in our first opinion had entered into a long term agreement covering the period from January 1, 1929 to December 31, 1970, for the cooperative use of power resources and the sale of electric energy on a unit rate or calculated value basis. This method of transacting business was substantially changed by the two party agreement between them of June 1, 1931. This provided in effect that Consolidated should be entitled to all the electric capacity and energy available to Penn Water from its plant at Holtwood on the Susquehanna and from Safe Harbor, and in return Consolidated agreed to pay Penn Water an amount equal to its operating expenses and a specified rate of return on Penn Water's invested capital; and then followed the illegal restrictions upon the activities of Penn Water which have already been described. For further details see 184 F.2d 552, 555.

The second contract of June 1, 1931, between the three utilities, sets forth in its preamble the construction of the hydro electric project at Safe Harbor, then pending, the activities in the electric power field of Consolidated in Maryland, and of Penn Water in Pennsylvania, the cooperative relations between the two companies under their agreement of December 31, 1927, supplemented by the agreement of June 1, 1931, and a plan for the joint financing of the new development at Safe Harbor by capital supplied two-thirds by Consolidated and one-third by Penn Water, the issuance of Safe Harbor stock to be held by them, and the issuance of Safe Harbor bonds to be jointly guaranteed by them. These two companies are described as the "receiving companies" entitled to all the capacity and energy available (other than any that may be required for the performance of any obligation imposed on Safe Harbor by law) from the initial development at Safe Harbor, the total entitlement to be divided between them in the proportion of two-thirds to Consolidated and one-third to Penn Water.

The Safe Harbor agreement also contains restrictions upon the rights and activities of Consolidated and Penn Water, as well as restrictions upon the freedom of contract and general activities of Safe Harbor, which led to the condemnation of the agreement by the District Court in the pending case. Article III requires Safe Harbor, at the request and for the benefit of either of the other two companies, to install additional machinery or equipment, not included in the initial development, subject, however, to the approval of the other party; and Safe Harbor agrees not to contract to supply power and energy (except any which may be required for the performance of any duty imposed upon it by law) from additions to its plant to any party other than the two named companies without the written consent of both.

Article IV declares it to be the intent of the agreement to encourage by cooperative effort the maximum use of the resources of the parties to the agreement so as to give the greatest practical benefit to the public, and to avoid unnecessary duplication of invoices and operation cost; and for this purpose Safe Harbor agrees that it will not enter into other agreements with either receiving company without the approval of the other.

Article V provides for the payment of stated annual sums to Safe Harbor by Penn Water and Consolidated for each of the years through 1937, and in no case less than the amount required by Safe Harbor to meet its bond interest, sinking fund requirements over and above operating expenses and depreciation allowance; and after 1937 for the payment of such an amount as may be required to yield to

Safe Harbor a net income of 7 per cent. on its actual investment in the initial development.

Article XIV provides that Consolidated and Penn Water shall each appoint one representative to act as its agent for investigation, consultation and advice in all operating, engineering and accounting matters pertaining to the agreement. These representatives are to be known as the operating committee and in case of their inability to agree, the question in dispute is to be submitted to the presidents of the receiving companies for decision.

The supplementary agreements of August 1, 1932 and November 22, 1939 illustrate the force and effect of the basic agreement of June 1, 1931. The agreement of 1932 expressly reaffirms the terms and provisions thereof; and provides for the construction of a switching station and adjacent transmission lines and a sub-station in Maryland. The supplemental agreement of 1939 requires Safe Harbor to proceed with and complete the installation of a 42,500 h. p. water wheel turbine and a 25 cycle single phase generator in its Safe Harbor Power House, and further provides that the Consolidated shall be entitled to two-thirds and Penn Water to one-third of all of the energy available therefrom.

That the two basic agreements of June 1, 1931 were parts of the same cooperative plan for the production and distribution of electric energy is too plain for argument. Indeed the three party contract of June 1, 1931 was spoken of by Consolidated in its brief in the prior case as a sister and supplemental contract to the two party contract of the same date, and it was asserted that the provisions of the two agreements were "inextricably inter dependent." This fact is established beyond dispute by the outline of the activities of the several parties to the two agreements and of the purposes they desired to accomplish by joint action, contained in the preamble of the three party agreement above described; and it is reinforced by the declaration of Consolidated and Penn Water in the preamble of the two-party contract that the Safe Harbor contract was made in accordance with their common intent. Since this is true, it follows as a matter of course that the three party agreement in suit must fall for the reasons set out in our earlier opinion for the invalidation of the companion contract. It is an integral part of an illegal plan which violates the federal anti-trust statutes and the public service laws of the State of Pennsylvania.

In addition, as the District Judge found, the restraints contained in the Safe Harbor contract itself are sufficient to invalidate it. It must be borne in mind that Safe Harbor is so located as to furnish power to customers in Pennsylvania and elsewhere, and that in fact its product is delivered over the lines of Pennsylvania Water to various utilities in Pennsylvania, Maryland and the District of Columbia; and were it not for the three party contract, Safe Harbor would be a potential competitor in this field. On this point the District Judge said: 97 F.Supp. 952, 953–954.

"Examining the agreement, we find its affront to the Act consists of the investiture of Penn and Consolidated with the absolute power to restrict the other, in the use and enjoyment by such other, of its rightful entitlement in Safe Harbor's production, as well as to restrict Safe Harbor in its freedom of contract and action generally. The principal restrictions are contained in Articles III and IV.

"Under Article III (a) 'additional machinery or equipment' shall be installed by Safe Harbor at the request of Consolidated or Penn at the expense and for the use of the requesting party, but only with the consent of the other. By the same Article no current from 'additions' to the Safe Harbor Plant may be supplied to anyone other than Penn and Consolidated without the consent of both of them. As an overall restraint, Article IV forbids Safe Harbor to 'enter into other agreements with either receiving company without the approval of the other.'

"These stipulations are strangulations. They choke each of the recipients in its full exercise of its ownership in the power purchased of Safe Harbor; they choke Safe Harbor too. They do not merely

limit one party from impinging the other's rights; their reach is more than defensive.

"No mechanical appliances, if and when available, could be furnished by Safe Harbor for Penn Water, though at Penn Water's expense, say to multiply, preserve or improve Penn Water's share, without Consolidated's approval, or vice versa. By forbidding the sale of power from such additions to anyone else, plant additions by Safe Harbor are effectually banned unless approved by *both* of the other two—even an addition for the benefit, and at the cost, of only one of them.

"As Safe Harbor may not contract in any manner as to the generation and supply of energy, with Penn or Consolidated without the assent of the other, neither Penn nor Consolidated could establish any other outlets, than those originally fixed at the plant to draw off its purchase of power, without the nod of the other. Consolidated having no direct connection with Safe Harbor could never obtain one if Penn objected. Article XII fixes the points of delivery from the Safe Harbor plant and makes any change dependant on the approval of both Penn and Consolidated. The supplemental agreement of August 1, 1932, exemplifies the enforcement of Article XII.

"Penn or `Consolidated could not by its sole direction release any part of its contract share to allow any portion to be sold and diverted elsewhere by Safe Harbor, notwithstanding Article III (c) contemplates such sales.

"Similarly Safe Harbor is barred from selling any power to others, assuming such power to become available through expansion of its plant, because under the contract it cannot sell, save to Penn and Consolidated, energy derived from additions.

"Threat of injury to the public from a contract of this kind is obvious, without reference to legislation, such as the Sherman Act, outlawing restraints.

\*     \*     \*     \*     \*     \*

"No less objectionable are the restrictions when the arrangement devised by the contract is viewed as solely a plan for the joint ownership and operation of the Safe Harbor plant by Penn Water and Consolidated, that is, if Safe Harbor Corporation be treated as merely an instrument for holding and operating the plant for the other two. If this were legally possible, or if the joint ownership and operation had been accomplished without the intervention of another corporation, the restrictions of the contract would be just as obnoxious. They would still enable each corporation unwarrantably to control the use and enjoyment by the other of its share of the joint product.

\*     \*     \*     \*     \*     \*

"Again, the agreement in suit as plainly transgresses the laws of the State of Pennslyvania as did the 2-party contract in the Penn Water Case, supra. Just as the agreement there disabled Penn Water from the performance of its public duties, so here the present contract through the restraints effected by Articles III and IV in the manner already pointed out, has caused Safe Harbor to contravene the Pennsylvania statutes prescribing the surrender to another, without the approval of its Public Utility Commission, of any of its powers, franchises or privileges."

We are told, however, that even if the Safe Harbor contract offends the anti-trust statutes and was therefore illegal in its inception in 1943, it has since become a valid contract because the Federal Power Commission approved it by an order of November 4, 1946 as a rate schedule after an investigation in a formal rate proceeding. Therein Safe Harbor was directed to reduce its rates so as to produce a return of 5 per cent. (instead of 7 per cent.) on its investment and to file a revised schedule effective January 1, 1947; but the remainder of the contract was left undisturbed. See 5 F.P.C. 221, 265. In compliance with this order Safe Harbor filed a revised rate schedule. See 6 F.P.C. 570-1.[1]

1. Prior thereto on January 14, 1936, the Safe Harbor contract was filed with the Commission as a rate schedule under Section 205(c) of the Federal Power Act, and on December 9, 1939, the supplemental agreement of November 22, 1939

The heart of the Commission's argument is that it has been given the authority to exempt a water power utility from the anti-trust acts by Sections 20, 205 and 206(a) and by other provisions of the Federal Power Act, 16 U.S.C.A. §§ 791a et seq., 813, 824d, 824e(a) which empower the Commission to regulate the activities and to fix the rates of a licensee under the Act in inter-state commerce. The Commission has the power to investigate the occupancy of nav-igable streams for the purpose of develop-ing electric power and to issue orders to conserve and use the water power resources of the region under Section 4(g); and the additional power to issue licenses for the development of water power in naviga-ble streams under Section 4(c), and to see to it that the plans of licensees shall be such as are best adapted to a comprehensive plan of water power development under Section 10(a); and the duty is imposed upon the Commission by Sections 202(a) and 202(b) to promote the voluntary inter-connection and coordination of facilities for the generation, transmission and sale of electric energy so as to assure an abundant supply thereof throughout the United States and for this purpose the Commission is em-powered and directed to divide the country into regional districts and under certain circumstances to order such interconnec-tions.

These statutes are obviously pertinent to the association of electric facilities which the contracts before us are designed to promote; and the facts tend to show that some cooperation between Safe Harbor and other electric utilities is essential to its greatest economic development and suc-cess. Safe Harbor is limited by its Penn-sylvania charter and certificate of public convenience to the hydro electric develop-ment and sale of electric power; and the scope of its operations is limited by the capacity of its power site and the flow of the river. Its output is therefore not uni-form and dependable and it must market its product to a utility or utilities possessed of facilities for the production of steam generated electric energy which can be economically utilized with that of Safe Harbor. The aggregate loads must be large enough to absorb Safe Harbor's output in low water periods to supplement the output of steam generated energy during peaking periods of demand; and also to absorb Safe Harbor's output in high flow periods when it can be used as a substitute for steam generated energy at a reduced cost. The sale of the entire output of Safe Harbor to other members of the pool at a fair price ensures an economic use of the available product and a fair return on the investment, and the resulting economies may be reflected in lower rates to consum-ers. The Commission is of opinion that Safe Harbor must become a member of such a power pool in order to utilize and to expand its facilities to its best advantage; and that the integrated and interconnected interstate system, composed of Safe Harbor and its two customers, Penn Water and Consolidated, is such a pool; and that therefore the Commission itself may ap-propriately prescribe the plan originally worked out by the parties and give it official sanction.

That the plan established by Penn Water and Consolidated is operative cannot be doubted since the experience of twenty years shows that it is practicable and suc-cessful; but it is by no means clear that the Commission has even given its approval to the restraints which the plan includes. The Commission's opinion of October 25, 1946, and its order of November 4, 1946 in pursuance thereof, in the Safe Harbor case, 5 F.P.C. 221, 265, were concerned with the jurisdiction of the Commission over Safe Harbor as a licensee and a public utility under the Act, and with the difficult task of ascertaining the company's rate base and prescribing a reasonable rate of return.

was filed with the Commission. Subse-quently a rate proceeding took place and a rate reduction order was passed on June 11, 1940, 2 F.P.C. 182, but on re-view this order was set aside in Safe Harbor Water Power Corp. v. F. P. C., 3 Cir., 124 F.2d 800, 808. On September 1, 1944 the Commision initiated another investigation of Safe Harbor's rates which culminated in the order of No-vember 4, 1946, affirmed on review in Safe Harbor Water Corp. v. F. P. C., 3 Cir., 179 F.2d 178, certiorari denied 339 U.S. 957, 70 S.Ct. 980, 94 L.Ed. 1368.

There was no discussion of the legality of the restrictions in the Safe Harbor contract either in the opinion of the Commission or in the opinion of the reviewing court, 179 F.2d 179. The legality of the two basic agreements of June 1, 1931, which established the power pool, seems to have been raised for the first time before the Commission in the companion investigation and rate proceeding to determine Penn Water's rates which was instituted by the Commission on September 1, 1944, simultaneously with the investigation of the rates of Safe Harbor above mentioned.

After the rate was fixed by the Commission, Penn Water filed an application for rehearing based *inter alia* on the ground, not previously considered, that the contract between Penn Water and Consolidated was null and void and unenforceable, and that the matter was in litigation between the two companies in the District Court in Maryland. This was the case which came to this court on appeal and was considered in 184 F.2d 552. The motion for rehearing was overruled by the Commission in an opinion, Re Pennsylvania Water & Power Co., 82 P U R NS 286, 289, in which the Commission said: (p. 291) "* * * If there are questions as to the legality of the foundation contracts which are in litigation, as respondents' application for rehearing indicates, the validity of our order is not dependent upon the decision of those questions. In our opinion and order we took care to leave the continuation of the operation of the integrated and interconnected system in full effect, *merely changing the rates,* as shown by our statement wherein we specifically stipulated that 'The present arrangement whereby sales to Pennsylvania customers are made on a firm basis on definite rates schedules whereas Baltimore Company takes what is left and assures respondent of the recovery of all proper operating expenses, depreciation, taxes, and a fair return, is the most practicable under the circumstances. That arrangement will, therefore, be continued with, however, such modifications as are necessary to accomplish the reductions mentioned above to Pennsylvania Power & Light, Philadelphia Company, Metropolitan Company, and Baltimore Company.' " (Italics added.)

This statement must of necessity be equally true of the Commission's order in the Safe Harbor rate case, for the question of illegality was not even broached in that proceeding, and it is inconceivable that the Commission would have taken one course with one member and an entirely different course with another member of the pool in respect to the important question of the illegality of the foundation contracts. It is obvious that the Commission did not prescribe the restrictive conditions of the contract as part of the rate order in either case, and that the District Judge was right in regarding our decision in the Penn Water case as a precedent governing the decision in the case at bar.

However that may be, the Commission's brief now asserts that the contractual restrictions are entirely lawful because it has exercised its statutory authority to approve them. In appraising this contention it is helpful to keep in mind that the Commission has not found and does not contend that the restrictions are essential to the existence and operation of the power pool, but only that they are appropriate. Indeed it is impossible to say that an effective power pool cannot be maintained without the prohibitions upon individual action contained in the two contracts which, for this purpose, may be considered one. These restrictions which tied the parties together and stifled individual initiative for the period of fifty years were made to promote the advantage of the persons in control and not primarily in the interest of the public. As we have seen, the contract deprived Penn Water of the power to control its prices or to extend its plant or its field of operations, and at the same time deprived Safe Harbor of the right to make additions to its plant or to sell its product without the consent of Penn Water and Consolidated, and deprived each of them of the power to deal separately with Safe Harbor. Moreover, and this is a matter of great importance, each of the constituent utilities, in view of the promises it made, lost the free right to initiate proceedings before the Federal Power Commission and

the public utility commission of its state with respect to matters affecting its business and the public interest. It is not surprising that no one ventures to contend that such an arrangement is essential to the success of the cooperative effort which the statute is designed to promote.

Hence we are brought back to what we have called the heart of the argument, that the Commission has been given the power in its discretion to exempt the members of a power pool from the prohibitions of the anti-trust laws and to sanction a pool which violates these statutes. This view won the approval of the majority of the United States Court of Appeals for the District of Columbia Circuit in Penn Water v. Federal Power Comm'n, 193 F.2d 230. In that case Penn Water petitioned the court to review the Commission's order of January 5, 1949 which established a new rate schedule as above mentioned, 82 P U R NS 193. The Commission had previously refused Penn Water's petition for rehearing based on the contention that its two party contract with Consolidated was invalid and was the subject of a suit in the District Court of Maryland. By the time that the rate proceeding reached the reviewing court for argument, our opinion invalidating the contract had been handed down and the Supreme Court had denied certiorari; and thereupon Penn Water petitioned the reviewing court to annul the Commission's rate reduction order and return the case to the Commission for further proceedings. The court refused the motion and passed on the merits of the case holding that the anti-trust acts were repealed by the Federal Power Act with respect to utilities subject to regulation by the Commission, and that the Commission's rate order was supported by substantial evidence. The gist of the ruling as to the repeal of the anti-trust acts is contained in the following excerpts from the court's opinion:

"The problem raised by the motions is one of the interrelation of two statutory schemes—each of which reflects different historical pressures and different conceptions of the public interest. The Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, and related laws represent an attempt to keep the channels of competition free so that prices and services are determined by the workings of a free market. * * * In marked contrast is a statute such as Part II of the Federal Power Act. It evidences congressional recognition that competition can assure protection of the public interest only in an industrial setting which is conducive to a free market and can have no place in industries which are monopolies because of public grant, the exigencies of nature, or legislative preference for a particular way of doing business. * * *

"These contrasting objectives indicate that the antitrust laws can have only limited application to industries regulated by specific statutes. Those laws, though quite properly viewed as having been intended 'to make of ours * * * a competitive business economy', are not constitutional mandates which freeze all aspects of our economic system for all time into the pattern of 'laissez-faire.' We think it obvious that they may not be extended beyond that part of the economy which Congress intended to leave to the operation of the free market. 'Certainly what Congress has forbidden by the Sherman Act it can modify. * * * (It) is not impotent to deal with what it may consider to be dire consequences of laissez-faire.'

"* * * The net effect of what we have already said is that, though regulated industries are not *per se* exempt from the antitrust laws and repeals by implication are not favored, the antitrust laws are superseded by more specific regulatory statutes to the extent of the repugnancy between them. * * * But where a statute provides for comprehensive and detailed regulation of a particular industry, as do the Interstate Commerce Act, 49 U.S. C.A. § 1 et seq., and the Federal Power Act, there is, as we have indicated, only a limited area for application of antitrust considerations to Commission decisions."

We are constrained to differ from this conclusion for the reasons set out in our opinion in Penn Water v. Consolidated,

4 Cir., 184 F.2d 552,[2] and in the following passage from the dissent of Judge Wilbur K. Miller of the Court of Appeals for the District of Columbia:

"These generalities boil down to the thesis that Part II of the Federal Power Act is repugnant to the anti-trust laws and therefore supersedes them to the extent of the repugnancy; and that the repugnancy extends so far as to exempt from the anti-trust laws the combination of utilities ordered by the Commission which is otherwise clearly illegal under those statutes.

"The majority do not point out with particularity the repugnancy upon which they rely. They seem to find it in the 'contrasting objectives' of the anti-trust acts and Part II of the Power Act, saying the first was designed to obtain the benefit of free competition, and the other to eliminate competition as having no place in the utility field and to substitute for it a regulatory agency. This being the only repugnancy suggested by the majority, their holding necessarily is that the anti-trust laws are superseded by Part II of the Power Act to the extent that the objectives of the two forms of legislation are in contrast. Let us see if there is really any repugnancy between the Sherman Act and Part II of the Power Act.

"The first section of the former, which is 15 U.S.C.A. § 1, declares illegal every contract, combination or conspiracy in restraint of trade or commerce. The 1931 contract between Penn Water and Consolidated was held violative of that section.

"Section 202, found in Part II of the Power Act, empowers the Commission to require the interconnection and co-ordination of the facilities of the two utilities. But neither that section nor any other section of Part II authorizes the Commission to require interconnection and co-ordination of facilities under terms and conditions which will result in a violation of the Sherman Act. The Commission can exercise its power under § 202 and under all of Part II without setting up an arrangement which is unlawful under anti-trust statutes. The Fourth Circuit intimated as much when it suggested that the interconnection of facilities and interchange of energy be continued 'by some method that would meet with the approval of the appropriate regulatory authority and will not offend either the anti-trust laws or the utility laws of Pennsylvania.' [184 F.2d 568.] The majority opinion does not suggest any reason why that cannot be done by the Commission.

"Since the Power Commission can perform all its functions under Part II without creating a violation of the Sherman Act, there is no repugnancy between the two statutes, and no room for the court to say that Part II superseded the anti-trust statutes."

The views set out in this dissent are supported by the decisions of the Supreme Court in Georgia v. Pennsylvania R. Co., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051; U. S. v. Terminal R. Ass'n of St. Louis, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810; McLean Trucking Co. v. U. S., 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544; U. S. v. South Eastern Underwriters' Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440; Southern S. S. Co. v. National Labor Relations Board, 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246; U. S. Alkali Ass'n v. U. S., 325 U.S. 196, 65 S.Ct. 1120, 89 L.Ed. 1554; U. S. v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181. The cases on which the Commission particularly relies are distinguishable. In Sunshine Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263, and U. S. v. Rock Royal Co-Op., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446, the governing statutes expressly granted exemption from the anti-trust acts of agreements approved by the regulatory body. In Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315, the court was not considering the acts of private parties in violation of the anti-trust

---

2. We considered in our opinion (1) the extent to which the anti-trust acts apply to utilities subject to the regulation of the Federal Power Commission, and (2) the jurisdiction of the District Court to pass on the legality of the basic contracts of the utilities although they are subject to regulation by the Federal Power Commission. Much that was said on these subjects is pertinent here.

statutes, but the right of the State of California to regulate and control the production of agricultural products within the state and to eliminate competition in the sale thereof; In Mackay Radio & Tel. Co. v. Federal Communications Comm'n, 68 App. D.C. 336, 97 F.2d 641, and Western Union Division v. U. S., D.C.D.C., 87 F.Supp 324, affirmed 338 U.S. 864, 70 S.Ct. 148, 94 L. Ed. 530, the courts were concerned with the power of the Federal Communications Commission to license particular persons only to occupy or to continue operations in a certain field and restrictive agreements between parties were not involved.

The decision of the Supreme Court in State of Georgia v. Pennsylvania R. Co., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051, is particularly apposite because it sustained the right of an injured party, in that case the State of Georgia, to seek an injunction from the court prohibiting a conspiracy of railroad carriers to fix the rates in violation of the anti-trust acts, although the rates had been approved by the Interstate Commerce Commission. It was pointed out that the complainant did not seek to prevent the continuance of the rates but merely to enjoin the rate fixing conspiracy. Passages in the opinion are descriptive of the situation now before this court. The court said: 324 U.S. at pages 456–457, 458, 459, 460, 65 S.Ct. at pages 726, 89 L.Ed. 1051.

" * * * But it is elementary that repeals by implication are not favored. Only a clear repugnancy between the old law and the new results in the former giving way and then only *pro tanto* to the extent of the repugnancy.

" * * * It is sufficient here to note that we find no warrant in the Interstate Commerce Act and the Sherman Act for saying that the authority to fix joint through rates clothes with legality a conspiracy to discriminate against a State or a region, to use coercion in the fixing of rates, or to put in the hands of a combination of carriers a veto power over rates proposed by a single carrier. The type of regulation which Congress chose did not eliminate the emphasis on competition and individual freedom of action in rate making. 1 Sharfman, The

Interstate Commerce Commission (1931), p. 81. The Act was designed to preserve private initiative in rate-making as indicated by the duty of each common carrier to initiate its own rates. Arizona Grocery Co. v. Atchison, T. & S. F. R. Co., supra. (284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348). If a combination of the character described in this bill of complaint is immune from suit that freedom of action disappears. The coercive and collusive influences of group action take its place. A monopoly power is created under the aegis of private parties without Congressional sanction and without governmental supervision or control.

" * * * The present bill does not seek to have the Court act in the place of the Commission. It seeks to remove from the field of rate-making the influences of a combination which exceed the limits of the collaboration authorized for the fixing of joint through rates. It seeks to put an end to discriminatory and coercive practices. The aim is to make it possible for individual carriers to perform their duty under the Act, so that whatever tariffs may be continued in effect or superseded by new ones may be tariffs which are free from the restrictive, discriminatory, and coercive influences of the combination. That is not to undercut or impair the primary jurisdiction of the Commission over rates. It is to free the rate-making function of the influences of a conspiracy over which the Commission has no authority but which if proven to exist can only hinder the Commission in the tasks with which it is confronted."

Further proceedings before the Federal Power Commission will doubtless be necessary if it is ultimately decided that the three party basic contract, as well as the two party basic contract, is invalid; but that course need not involve embarrassment. The problem of the Commission would then be to devise a plan which will effectuate the purposes of the Federal Power Act and at the same time conform to the anti-trust statutes. This would not seem to be an impossible or unreasonable duty to perform. As was said in Southern

100

S. S. Co. v. National Labor Relations Board, 316 U.S. 31, 47, 62 S.Ct. 886, 894, 86 L.Ed. 1246: "Frequently the entire scope of Congressional purpose calls for careful accommodation of one statutory scheme to another, and it is not too much to demand of an administrative body that it undertake this accommodation without excessive emphasis upon its immediate task."

There need be no interference with the rate making power or the overall control of the Federal Power Commission. We repeat with respect to Safe Harbor what was said in regard to Penn Water in our prior opinions, 184 F.2d 552, 568, and 186 F.2d 934, 937:

"It is not our function in this case to decide how far the activities of Penn Water and Consolidated under the basic contract are subject to the regulations of the Federal Power Commission or the Pennsylvania Public Utility Commission, either or both. * * * It may well be, although the present arrangement between the Maryland and Pennsylvania utilities is invalid for the reasons set forth, that an interconnection of facilities and an interchange of electrical energy between them may be continued by some method that would meet with the approval of the appropriate regulatory authority and will not offend either the anti-trust laws or the utility laws of Pennsylvania." 184 F.2d 568

"Throughout the trial of this case and in the argument of the pending motion, Penn Water has reiterated its desire to continue to supply electric energy to Consolidated; and in view of the close relationship between the parties, the existence of interconnecting equipment and the control over its rates by the regulatory bodies, there is no reason to fear that the interests of consumers of electricity in Maryland will suffer through the invalidation of the existing contract between the two utilities." 186 F.2d 937.

The judgment of the District Court is affirmed.